# EXHIBIT A

## SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF NEW YORK

| | |
|---|---|
| **JAMES LOWE, individually, and on behalf of all others similarly situated,** | |
| **Plaintiff,** | **CASE NO.:** |
| **v.** | |
| **MONEYLION TECHNOLOGIES, INC., d/b/a MONEYLION,** | **DEMAND FOR JURY TRIAL** |
| **Defendant.** | |

### <u>CLASS ACTION SUMMONS</u>

Plaintiff designates NEW YORK COUNTY as the place of trial.  The basis of venue is the defendants' residences.  Defendant MONEYLION TECHNOLOGIES, INC. and its subsidiary ML Plus, LLC are located at 249 W. 17th Street, Floor 4, New York, NY 10011 .

*To the above-named Defendant:*

**YOU ARE HEREBY SUMMONED** and required to serve upon THOMAS M. MULLANEY, ESQ., whose address is 530 Fifth Avenue, 23RD Floor, New York, New York, 10036, an answer to the complaint which is herewith served upon you, within twenty (20) days after service of this summons upon you, if served upon you personally within the State of New York, or within thirty (30) days if served upon you outside of the State of New York and/or by other than personal means.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

/s/ _____
Thomas M. Mullaney
Attorney for Plaintiff

Dated:  New York, New York
        March 17, 2025

Case 1:25-cv-04098     Document 1-1     Filed 05/15/25     Page 4 of 77

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| **JAMES LOWE, individually, and on behalf of all others similarly situated,** | |
| **Plaintiff,** | **CASE NO.:** |
| **v.** | **CLASS ACTION** |
| **MONEYLION TECHNOLOGIES, INC., d/b/a MONEYLION,** | **DEMAND FOR JURY TRIAL** |
| **Defendant.** | |

<u>**CLASS ACTION COMPLAINT**</u>

Plaintiff James Lowe, on behalf of himself and all others similarly situated, alleges the following based upon personal knowledge as to himself and upon information and belief and the investigation of his counsel as to all other matters, and brings this Class Action Complaint against MoneyLion Technologies, Inc. (D/B/A MoneyLion) (collectively, "MoneyLion" or "Defendant") and alleges as follows:

## I.     NATURE OF THE ACTION

1.     This Complaint seeks to protect active-duty military service members from MoneyLion's predatory lending practices that violate the Military Lending Act, 10 U.S.C. § 987, *et seq.* ("MLA") and the Truth in Lending Act, 15 U.S.C. § 1638 ("TILA"). The MLA was enacted to protect United States active-duty service members and their dependents (collectively, "Covered Borrowers") from predatory lending. Excessive debt endangers our nation's military readiness and is detrimental to service-member retention, morale, household stability, security clearances, and career advancement. Notably here, MoneyLion makes no

1

Case 1:25-cv-04098    Document 1-1    Filed 05/15/25    Page 5 of 77

effort to fulfill its duty to determine whether it is lending to Covered Borrowers or to provide legally mandated protections for them.

2. MoneyLion is in the business of payday lending through an earned wage access ("EWA") product—it makes funds available to its customers, who repay MoneyLion principal and finance charges (including expedite fees and so-called "tips") on payday. Its business model entails making high-frequency, short-term, and high-cost loans to consumers living paycheck to paycheck. Despite advertising its loans as having "no interest," in practice, MoneyLion takes in **triple** and sometimes **quadruple** digit finance charges from its customers. Defendant issued Plaintiff many stratospherically expensive loans, with at least one such loan exceeding **1,090%** military APR. The end result is a financial product that extracts exorbitant fees from workers, encourages serial usage and dependance on the costly loans, worsens workers' financial circumstances, and traps them in a cycle of debt.

3. Plaintiff, a Specialist, has used MoneyLion's "Instacash" product for years. By virtue of, *inter alia*, the sky-high fees charged for early access to his salary, MoneyLion has extended consumer credit to Plaintiff on numerous occasions in violation of the MLA and TILA.

4. Borrowing money that is repaid on payday is not an innovation; it is a loan. As EWA products have become more popular, the parallels to payday lending are striking. Like payday loans, EWA products can trap users in a cycle of reborrowing that increases their financial distress, all in service of generating revenue for predatory lenders. Considering the substance of the transactions, Defendant's "Instacash" transactions are in reality extensions of consumer credit.

2

5.     In violation of the MLA, Defendant uses its Instacash product to saddle Covered Members with charges that yield a military annual percentage rate ("MAPR") well in excess of the MLA's legal limit.

6.     MoneyLion's consumer credit agreements violate the MLA in at least four ways: By (1) charging interest above the 36% statutory MAPR cap; (2) failing to provide any required MLA Disclosures; (3) including a class action and jury trial waiver; and (4) including a mandatory binding arbitration clause. 10 U.S.C. § 987(b), (c) & (e)(1)(2)(5)(6).

7.     MoneyLion systematically violates the Truth in Lending Act by failing to make required disclosures concerning the interest rate charged as part of its loan agreements with consumers.

8.     Among the abusive lending practices the MLA is designed to curb is predatory payday loans made to servicemembers.[1] In a Department of Defense report on predatory lending practices affecting military members (the "Report"), the egregious lending practices prevalent in the payday lending industry are highlighted.[2] The Report notes that payday lenders are "heavily concentrated around military bases," with statistics showing that communities with military installations "rank among the most heavily targeted communities in their respective states."[3] Military populations are targeted for an obvious reason: "active-duty military personnel are three times more likely than civilians to have taken out a payday loan," with such loans costing servicemembers over $80 million in abusive fees annually as of 2005.[4]

---

[1] *Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents*, U.S. DEP'T OF DEFENSE (Aug. 9, 2006), available at https://apps.dtic.mil/sti/pdfs/ADA521462.pdf.
[2] *Id.* at 10–16.
[3] *Id.* at 10–11.
[4] *Id.* at 11.

3

9.      MoneyLion's business practices violate the MLA and TILA and are part of a systematic nationwide policy and practice. Plaintiff Lowe seeks to hold Defendant accountable for its actions and prevent its predatory lending practices from continuing.

## II.     PARTIES

10.     At all times relevant, Specialist Lowe has been a resident of Georgia. He has been a member of the National Guard since 2008 and is currently a machine mechanic stationed at Fort Benning in Georgia.

11.     During the class period, Specialist Lowe has been a Covered Borrower and an active-duty service member employed by the Army National Guard.

12.     MoneyLion Technologies Inc. (known until September 2021 as MoneyLion Inc.) is a Delaware corporation headquartered in New York, New York. Through its digital-technology platform, including its website and mobile app, MoneyLion has offered, brokered, and extended online installment loans, engaged in the servicing and collections of such loans, and provided other financial products and services to consumers, as described below.

13.     MoneyLion has offered loan agreements to consumers, including Covered Borrowers, since at least 2013, entering into millions of credit transactions.

## III.     JURISDICTION AND VENUE

14.     This Court has personal jurisdiction over Defendant because Defendant conducts business in this State and keeps its headquarters in New York, New York.

15.     Additionally, the terms of service for MoneyLion's Instacash product provide for exclusive jurisdiction New York County, New York.[5] Jurisdiction and venue are therefore proper in this Court.

---

[5] "Any dispute that is not subject to arbitration . . . shall be brought in the appropriate state or federal court located in New York County, New York." MoneyLion, *MoneyLion Terms of Service*, https://www.moneylion.com/terms-and-conditions/#ml-instacash (last visited Mar. 13, 2025).

4

## IV.     LEGAL BACKGROUND

### a.     The MLA Was Specifically Designed to Curb Predatory Payday Loans to Covered Members

16.     The DoD's Report on lending practices discussed the payday lending industry at length.[6] The Report noted that payday lenders were "heavily concentrated around military bases," with statistics showing that communities with military installations "rank among the most heavily targeted communities in their respective states."[7]

17.     Military populations were targeted for an obvious reason: "active-duty military personnel are three times more likely than civilians to have taken out a payday loan," with such loans costing servicemembers millions in abusive fees.[8] Moreover, the military payment architecture, and the Uniform Code of Military Justice to which servicemembers are bound, make them particularly vulnerable to predatory payday loans:

> Check-holding, a central feature of payday loans, is particularly risky for military borrowers. Every payday loan involves a prospective "bad" check. Military borrowers are required to maintain bank accounts in order to receive direct deposit of military pay and are subject to the Uniform Code of Military Justice that penalizes deliberately writing a check not covered by funds on deposit. Borrowers become trapped in repeat borrowing or renewals of loans in order to keep the check used to obtain the loan from bouncing, a key reason that payday loans are debt traps.[9]

18.     While the precise EWA product offering was developed somewhat recently, its genre (small-dollar, short-duration, high-cost loans) is nothing new. In 2006, the DoD noted military "borrowers encounter[ed] a booming virtual market of small loan offers, payday loans,

---

[6] Report, *supra* n.1.
[7] *Id.* at 10–11.
[8] *Id.* at 11.
[9] *Id.* at 14. To be sure, EWA providers like MoneyLion do not collect physical checks from their customers at loan initiation but instead take a virtual check by requiring Covered Members to authorize automatic debits from bank accounts to repay their loans.

5

and 'military loans' via the Internet."[10] Those loans, like MoneyLion's, "are delivered and collected online through electronic fund transfer." [11]

19.    The Report noted key similarities between the various predatory lending products—including payday loans and internet loans—that target the military, which accurately encapsulate MoneyLion's business model:

(1) Predatory lenders seek out young and financially inexperienced borrowers who have bank accounts and steady jobs, but also have little in savings, flawed credit or have hit their credit limit. These borrowers are less likely to weigh the predatory loan against other opportunities and are less likely to be concerned about the consequences of taking the loan.

(2) Predatory lenders make loans based on access to assets (through checks, bank accounts, car titles, tax refunds, etc.) and guaranteed continued income, but not on the ability of the borrower to repay the loan without experiencing further financial problems.[12]

(3) . . . Increasingly the Internet is used to promote loans to Service members.

(4) Predatory products feature high fees/interest rates, with some requiring balloon payments, while others pack excessive charges into the product. The result of their efforts is to obfuscate the comparative cost of their product with other options available to the borrower.

. . .

(6) Predatory lenders attempt to work outside of established usury limits, either by attempting to obtain exemptions from federal and state statutes or by developing schemes designed to circumvent existing laws.[13]

20.    The Report further found "high interest loans, whether provided as a payday loan, military installment loan, or as a result of unscrupulous automobile financing can leave a Service member with enormous debt, family problems, difficulty maintaining personal

---

[10] *Id.* at 15.
[11] *Id.* at 16.
[12] To that end, lenders' "use of checks, access to bank accounts, [and similar other methods of extracting repayment] pressure the borrow to consider loan payments as being their top priority." *Id.* at 44.
[13] *Id.* at 21–22.

6

readiness and a tarnished career."[14] As if being trapped in a debt cycle is not bad enough, some servicemember victims of payday and other lenders experienced disciplinary action (ranging from reprimands to "loss of promotions and separation from the military") as a result of their financial hardship.[15]

21.     Drawing from the bountiful evidence of servicemember abuse at the hands of predatory lenders, the DoD concluded it could not "prevent predatory lending without assistance from Congress, the state legislatures, and federal and state enforcement agencies."[16]

22.     To curb usurious interest rates, excessive annual percentage rates (APRs), and bogus fees, the DoD requested legislation that would prevent lenders from preying on service members and endangering the nation's military readiness.[17]

23.     The American Bar Association and Navy-Marine Corps Relief Society likewise submitted letters in support of the DoD's request, noting the "urgent need for remedial Congressional action" to curb predatory loan practices harming Service members.[18]

24.     Congress answered the call and passed the MLA to protect Covered Borrowers from unfair, deceptive, and excessively priced loans.

**b.     The Military Lending Act**

25.     In the wake of the DoD's investigations, in 2006, the Military Lending Act, 10 U.S.C. § 987 *et seq.*, was enacted.

---

[14] *Id.* at 39.
[15] *Id.* at 41–42.
[16] *Id.* at 46.
[17] Specifically, the DoD requested legislation protecting Service members "from unfair, deceptive lending practices and usurious interest rates and to require uniform disclosure of credit and terms. Specifically, lenders should not be permitted to base loans on prospective bad checks, electronic access to bank accounts, mandatory military allotments, or titles to vehicles. All costs involved in borrowing should be included in interest rate calculations and disclosures. Laws and regulations must be changed to close regulatory loopholes that leave non-resident military borrowers unprotected in many states." *Id.*
[18] *Id.* at 54–56.

7

26.     The MLA makes it unlawful for a creditor to "impose an annual percentage rate of interest greater than 36 percent with respect to the consumer credit extended to a Covered Member or a dependent of a Covered Member." 10 U.S.C. § 987(b).

27.     The MLA also requires mandatory disclosures in "consumer credit" [19] transactions with Covered Borrowers, which include:

- A statement of the annual percentage rate of interest applicable to the extension of credit, 10 U.S.C. § 987(c)(1)(A);

- Any disclosures required under the Truth in Lending Act, 10 U.S.C. § 987(c)(1)(B); and

- A clear description of the payment obligations of the member or dependent, as applicable, 10 U.S.C. § 987(c)(1)(C).

28.     Additionally, the MLA prohibits creditors from including provisions in a consumer-credit transaction that require the Covered Borrow to submit to arbitration or to waive the borrower's right to legal recourse. 10 U.S.C. § 987(e).

29.     The MLA also makes it unlawful to charge a Covered Borrower any penalty or fee for prepaying all or part of the loan. 10 U.S.C. § 987(e).

**c.      The Truth in Lending Act**

30.     The Truth in Lending Act, codified at 15 U.S.C. § 1638, protects consumers by, *inter alia*, (i) requiring lenders to clearly disclose all terms and costs associated with loans, (ii) allowing borrowers to easily compare different credit options, and (iii) preventing predatory lending practices by making loan details transparent and standardized. In essence, TILA promotes informed use of consumer credit by providing full disclosure of loan terms.

---

[19] Under the MLA, consumer credit is defined as "credit offered or extended to a Covered Borrower primarily for personal, family, or household purposes," subject to a finance charge or payable by written agreement in more than four installments and outside the ambit of any of the identified exceptions.

8

31.     Under TILA, creditors are required to make certain disclosures when participating in closed-end credit transactions, such as those MoneyLion offers here. MoneyLion fails to make any of the following required disclosures:

- "The 'amount financed', using that term, which shall be the amount of credit of which the consumer has actual use," 15 U.S.C. § 1638(2)(A);

- "a statement of the consumer's right to obtain, upon a written request, a written itemization of the amount financed," *id.* at § 1638(2)(B);

- "The 'finance charge', not itemized, using that term," *id.* at § 1638(3);

- "The finance charge expressed as an 'annual percentage rate', using that term," *id.* at § 1638(4);

- "The number, amount, and due dates or period of payments scheduled to repay the total of payments," *id.* at § 1638(6);

- "Descriptive explanations of the terms 'amount financed', 'finance charge', 'annual percentage rate', 'total of payments', and 'total sale price' as specified by the Bureau," *id.* at § 1638(8);

- "Where the credit is secured, a statement that a security interest has been taken in (A) the property which is purchased as part of the credit transaction, or (B) property not purchased as part of the credit transaction identified by item or type," *id.* at § 1638(9);

- "A statement indicating whether or not the consumer is entitled to a rebate of any finance charge upon refinancing or prepayment in full pursuant to acceleration or otherwise, if the obligation involves a precomputed finance charge," *id.* at § 1638(11); and

9

- "A statement that the consumer should refer to the appropriate contract document for any information such document provides about nonpayment, default, the right to accelerate the maturity of the debt, and prepayment rebates and penalties," *id.* at § 1638(12).

## V.    FACTS

**a.    The Earned Wage Product Market and MoneyLion**

    **i.    EWA Products Charge High Fees and Wreak Havoc on Borrowers' Financial Health**

32.     A significant driver of demand for consumer credit and financial products stems from the mismatch between when a family receives income and when they pay expenses. Employees generally provide services before being paid for their labor and are typically paid in arrears on a biweekly or semi-monthly cycle. To meet liquidity challenges, consumers have for years turned to credit cards, personal installment loans, and payday loans.

33.     Recently, an old product with new packaging—coined "earned wage access" or "earned wage advance" ("EWA")—was created and offered to consumers to address the same need. While marketed as a novel financial technology ("fintech") device, in practice, EWA products are garden variety cash advances.

34.     EWA products provide workers, before their payday, with a portion of their earned but unpaid wages or to funds that purport to equal or approximate a portion of their unpaid wages. Loaned funds are repaid via automated withdrawal from the consumer's bank account.

35.     Defendant MoneyLion is one of the fintech companies that provides an EWA product, which it calls "Instacash." "Instacash provides cash advance(s) to you from time to

time, in MoneyLion's sole discretion, based on your anticipated recurring direct deposits (each such advance, an '**Instacash Advance**')."[20]

36.     To repay these loans, users must authorize MoneyLion to charge their debit card or initiate an electronic fund transfer from a bank account.[21] For users who have provided more than a single payment method (*i.e.*, a debit card *and* bank account) and have insufficient money in their primary payment account to payoff an Instacash loan, MoneyLion requires users to authorize MoneyLion to "debit your backup payment method for the remaining amount to be repaid."[22]

37.     EWA providers advertise their products as "free" or "no interest" while obscuring the ways in which they bilk consumers for fees and other finance charges that add up to loan-shark rates.

38.     EWA providers, including MoneyLion, are generally paid through two types of fees: (1) expedite fees, and (2) through so-called "tips."

39.     First, **expedite fees** (referred to by MoneyLion as "Turbo delivery fees") are charged to provide instant access to loan funds. For "Instacash" advances to external bank accounts, MoneyLion charges:

- $1.99 for instant access to loans of $5 or less;
- $3.99 for loans between $10 and $25;
- $4.99 for loans between $30 and $45;
- $5.99 for loans between $50 and $65;
- $7.49 for loans between $70 and $85; and
- $8.99 for loans between $90 and $100.

---

[20] *MoneyLion Instacash Terms and Conditions*, MONEYLION, https://www.moneylion.com/terms-and-conditions/#ml-instacash (updated as of Dec. 2024).
[21] *Id.*; *see also MoneyLion Instacash*, https://www.moneylion.com/cash-advance/instacash (last visited Mar. 13, 2025) ("Instacash repayments are automated, making it easy to pay on your scheduled repayment date and replenish your Instacash so it's ready when you need it next! On each scheduled repayment date, the amount of Instacash you received and any related optional Tips and optional Turbo Fees will be automatically deducted from your authorized payment account or debit card.").
[22] *Id.*

11

40.     The actual cost to provide customers with instant access to funds is less than $0.05.[23]

41.     The speed of access to funds is an essential and defining aspect of EWA products. They are designed to address—and marketed as addressing—what is generally a less-than two-week liquidity problem.

42.     MoneyLion's website includes numerous representations about the speed of access to funds, like "Get Cash Today" and "Available in minutes"

43.     While expedite fees are notionally optional and users can use an EWA product without paying one, they are difficult to access and negate their usefulness to consumers. For instance, the free, non-expedited version of a MoneyLion cash advance "will typically be available in your [bank account] between one (1) and five (5) business days from the date of your request."[24] Conversely, the expedited service takes just a few minutes. This delay is problematic for MoneyLion's intended users, consumers living paycheck to paycheck who turn to EWA providers for the precise reason that their need for cash is urgent and cannot wait.

44.     Indeed, a recent study found that the average loan term for EWA loans was only ten days.[25] Consumers who cannot wait ten days to access their wages certainly will pay whatever fees an EWA provider charges to obtain their funds as quickly as possible. As a result, the vast majority of EWA users pay expedite fees to obtain immediate funds disbursement.[26]

---

[23] *Simple, Transparent, Uniform Pricing for All Financial Institutions*, THE CLEARINGHOUSE (showing cost of RTP instant credit transfer at $0.045), available at https://www.theclearinghouse.org/-/media/new/tch/documents/payment-systems/rtp_-pricing_02-07-2019.pdf.
[24] *MoneyLion Instacash Terms and Conditions*, MONEYLION, https://www.moneylion.com/terms-and-conditions/#ml-instacash (updated as of Dec. 2024).
[25] Lucia Constantine, Christelle Bamona, Sara Weiss, *Not Free: The Large Hidden Costs of Small-Dollar Loans Made Through Cash Advance Apps*, CTR. FOR RESPONSIBLE LENDING, at 10 (Apr. 2024) (hereinafter "*Not Free*").
[26] One recent survey found 79% of EWA users typically paid expedite fees to receive funds faster. *Not Free*, at 3. Likewise, the Consumer Financial Protection Bureau found 96% of fees paid by consumers using employer-integrated EWA providers were for expedite fees. Consumer Financial Protection Bureau, Data Spotlight: Developments in the Paycheck Advance Market (July 18, 2024),

12

45.     Turning to the second type of fee, "**tips**" are simply additional funds the lender prompts the user to pay.

46.     These purported "tips" serve no purpose whatsoever to MoneyLion customers and instead go directly to MoneyLion's bottom line.

47.     EWA providers like MoneyLion deploy techniques borrowed from behavioral economics to pressure users into tipping each time they obtain an EWA loan. For example, the California Department of Financial Protection and Innovation ("DFPI") listed "multiple strategies that lenders use to make tips almost as certain as required fees," including "[s]etting default tips and using other user interface elements to mak[e] tipping hard to avoid; [m]aking it difficult to set a $0 tip or not advertising that a particular payment is optional; and [c]laiming that tips are used to help other vulnerable consumers or for charitable contributions."[27]

48.     MoneyLion weaponizes each of these strategies against its customers to secure tips, and to great effect. A recent data summary found that EWA providers that request tips receive them in 73% of transactions, on average $4.09 in tips per transaction.[28] Example tip screens MoneyLion shows its customers are included below:

---

https://www.consumerfinance.gov/data-research/research-reports/data-spotlight-developments-in-the-paycheck-advance-market/.

[27] *2021 Earned Wage Access Findings*, CAL. DEP'T FIN. PROTEC. & INNOVATION, at 61–62 (March 2023), https://dfpi.ca.gov/wp-content/uploads/sites/337/2023/03/PRO-01-21-ISOR.pdf (hereinafter "DFPI Findings")

[28] *Id.* at 62.

13



49.     One of MoneyLion's competitors—who offers a substantially similar EWA product and deploys the same strategies used by MoneyLion in soliciting tips—said in public testimony that 40% of its revenue comes from tips alone.[29] Another of MoneyLion's competitors—who likewise offered a materially similar EWA product for which it solicited tips—reported receiving more than $56,000,000 in tips in 2023 alone, approximately 22% of the company's revenue for that year.[30] Upon information and belief, MoneyLion receives millions of dollars annually in so-called "tips."

50.     When properly viewing EWA products' tips and expedite fees as costs of credit (*i.e.* finance charges), the annual percentage rates (APR) for these loans are eye-popping.

---

[29] Vt. House Comm. on Com. and Econ. (2023, February 14), at 2:16:45, available at https://www.youtube.com/clip/Ugkx7fEU-NXc2ZggurJSRZTHXm_rpCNHzVcU.
[30] *Dave Inc. Form 10-K*, available at https://investors.dave.com/static-files/26e2fc51-3b9e-432b-9b70-37b7e44cadac (last visited Mar. 13, 2025).

14

51.     A recent study found the average APR imposed by EWA providers (that collect tips and expedite fees) is 334%, in line with payday loans:



52.     The APR received by MoneyLion for its Instacash product is similar, though sometimes *much higher*. As discussed *infra*, some of MoneyLion's loans to Plaintiff were even more expensive, with APRs as high as **1,093%**. *See infra*.

53.     Ironically, MoneyLion and other EWA providers market their products as low-cost alternatives to payday loans.[31] In truth, MoneyLion is a wolf in sheep's clothing: extending loans with APRs nearly identical to the exorbitantly-priced payday loans it claims to replace.

54.     On top of charging loan-shark interest rates, MoneyLion and others limit the amount a borrower can access per advance, while simultaneously allowing multiple advances per day and per pay period, thereby fostering repeat withdrawals and concomitant repeated payment of expedite fees and tips.

---

[31] *What Do You Need for a Payday Loan*, MONEYLION.COM: BORROW (Feb. 21, 2025), https://www.moneylion.com/learn/what-do-you-need-for-a-payday-loan/ (characterizing EWA products as a "safer alternative" to a payday loan); *see id.* ("Access funds directly from your paycheck without the high fees of payday loans.").

15

55.     MoneyLion limits the amount its customers can borrow on a daily and per pay period basis. The limitations (MoneyLion's "Instacash limit") vary depending on the borrower's "anticipated income amount" and whether the borrower has their loan proceeds delivered to an external account or deposited in a "RoarMoney account."[32] Many borrowers, including Plaintiff, are permitted to borrow up to $500 per day but only in $100 increments, meaning a borrower paying a Turbo fee on all five loans would pay a whopping $44.95 *in Turbo fees alone* for access to a short-term $500 cash advance.

56.     This architecture maximizes fees for EWA providers like MoneyLion, while creating a debt trap for vulnerable consumers. "By imposing limitations on how much can be borrowed in a single advance, while allowing more than one advance per pay period, lenders force borrowers to take out multiple advances—and pay multiple fees—to access more money. The business model capitalizes on most borrowers' financial precarity, and the user interface of these products makes paying a fee or leaving a tip difficult to avoid."[33]

57.     The end result is a product that traps consumers in cycles of debt, worsens their financial circumstances, leads to more overdraft fees, and an ever-increasing reliance on emergency funds from—and the fees that come with—EWA loans.

58.     A CRL analysis found consumers who used EWA products took out advances repeatedly, with many taking advances on the same day or the day after repayment and were consequently more likely to overdraft their accounts and be forced to pay overdraft fees. Specifically, the CRL found that 27% of EWA users take out at least 25 loan advances a year,

---

[32]     *MoneyLion            Instacash*,            https://www.moneylion.com/cash-advance/instacash?traffic_src=web&medium=secondnav&campaign_id=cash-advance/instacash (last visited Mar. 13, 2025).
[33] Candice Wang, Lucia Constantine, Monica Burks, Yasmin Farahi, *A Loan Shark In Your Pocket: The Perils of Earned Wage Advance*, CTR. FOR RESPONSIBLE LENDING, at 7 (Oct. 2024) (hereinafter "*Loan Shark*").

and for 33% of users, the vast majority (80%) of their borrowing is followed by reborrowing within two weeks.[34] This suggests receiving a reduced paycheck (*i.e.*, reduced to pay back EWA loans and fees) necessitated taking out more advances in the following pay period.

59.     Another CRL study found that using EWA products is closely correlated with overdraft fees. "Overdrafts on consumers' checking accounts increased 56% on average after use of an advance product."[35]

### ii.     EWA Providers Utilize Strict Underwriting Procedures and, Consequently, Almost Always Collect

60.     While EWA products are financially disastrous for customers, they have proven profitable for the companies selling them. These companies maximize profits by using exacting underwriting procedures that ensure cash advances, and the fees that accompany them, are timely repaid through automated bank account debits that borrowers authorize when taking out the loans.

61.     MoneyLion has various criteria borrowers must meet to be eligible for an Instacash advance. For instance, prospective borrowers must link a bank account to the MoneyLion app and that account must (1) have been active for at least sixty days, (2) receive regularly scheduled income deposits—which in turn must be payroll-related, government benefits, or pension payments—and (3) be registered to the MoneyLion accountholder.

62.     A borrower must demonstrate consistent payment history, generally at least three recurring direct deposits from the same source to the linked bank account.

63.     MoneyLion routinely rejects applicants whom it deems insufficiently creditworthy. Reasons for rejection include failure to link an account, irregular paychecks, not enough transaction history, or missed payments on other loan products offered by MoneyLion.

---

[34] *Loan Shark*, *supra* note 33, at 7.
[35] *Not Free*, *supra* note 25, at 6.

17

64.    MoneyLion takes steps to verify its borrowers' consistent income by obtaining and reviewing troves of financial data in qualifying consumers for Instacash advances.

65.    To determine whether a borrower is creditworthy and decide how much credit to extend in the first place, MoneyLion requires users to connect their accounts to MoneyLion through Plaid. Plaid is a financial services provider that partners with MoneyLion and other fintech companies to allow them to view customer banking information. Plaid allows MoneyLion to "[q]uickly verify assets and income" of borrowers, providing "real-time insights into a borrower's income and employment in seconds with a breakdown of earnings from salaries, gig work, and more."[36]

66.    In addition to using Plaid to peruse borrower bank accounts, MoneyLion requires borrowers provide it direct access to their payroll records using "Pinwheel." Pinwheel is another financial services company that provides "real-time income and employment verifications" to enable "underwriting with verified data – directly from the source of truth."[37] In short, through the payroll records obtained through Pixel, MoneyLion obtains a "full income picture" of its borrowers in "real-time."[38] MoneyLion thus knows precisely when and how much its borrowers will be paid before they are paid, and is given advance notice of income changes (*i.e.*, in the event a borrower gets a raise or pay cut, quits or is fired) that affect the likelihood of MoneyLion's loans being repaid.

67.    MoneyLion uses its real-time insight into customer financials to ensure borrowers will have sufficient funds to repay their loans on payday (*i.e.*, in the underwriting

---

[36] *Plaid Solutions: Credit*, Plaid.com, https://plaid.com/solutions/credit/ (last visited Mar. 13, 2025).
[37]    Pinwheel, *Real Time Income and Employment Verifications*, https://www.pinwheelapi.com/products/verify-income-employment (last visited Mar. 13, 2025).
[38] *Id.*

18

process) and to schedule its repayment debits as soon as payday hits, ensuring their loans are paid as soon as funds become available.

68.     MoneyLion's underwriting process is both detailed and continual. MoneyLion continually adjusts maximum withdrawal amounts—both daily and per pay period— depending on the individual's borrowing history and financial health (as gleaned through Plaid and Pinwheel).

69.     For borrowers who qualify, MoneyLion monitors their financial health to determine how much credit to extend based on borrowers' need and ability to repay. In determining how much credit to extend, MoneyLion considers a variety of factors including the consistency of deposits, the borrowers' history of paying back Instacash loans, bank account balances, account activity, and other factors.[39]

70.     Through its constant underwriting process, MoneyLion extends loans to borrowers only when it is confident they will repay.

71.     For qualifying borrowers, MoneyLion generally begins by offering relatively low amounts of credit, with new borrowers unlocking "a minimum of $10 after linking your external deposit account." Borrowers obtain greater access to credit—*i.e.*, MoneyLion raises their maximum loan limit—by consistently paying off loans to MoneyLion on time and generally improving their financial health (which MoneyLion monitors by directly viewing borrowers' financial and payroll accounts through Plaid and Pinwheel).[40]

---

[39]    *Why Amounts and Limits May Change*, MONEYLION.COM, https://www.moneylion.com/resources/why-amounts-and-limits-may-change/#:~:text=Instacash%20is%20an%20optional%20service,factors%20as%20determinde%20by%20MoneyLion (last visited Mar. 17, 2025).

[40]    *See, e.g., id.* (explaining borrowers may increase their loan limits by demonstrating consistent income and may "boosts" their credit limit by "making two or more consecutive on-time payments"), https://www.moneylion.com/resources/why-amounts-and-limits-may-change/#:~:text=Instacash%20is%20an%20optional%20service,factors%20as%20determinde%20by%20MoneyLion.

19

72.     Additionally, changes to financial factors, such as "a shift in the regularity of detectable recurring deposits, a salary increase, a salary decrease," more or fewer deposits, or "other factors" may result in changes to a borrower's Instacash limit. At bottom, "the more money you have coming into your account that [MoneyLion] can verify, the greater likelihood you'll qualify for more Instacash."[41]

73.     These underwriting methodologies—extending credit only to those who will repay, and only in amounts that are likely to be repaid—are precisely the same methods used by traditional credit issuers, like banks. "US credit card lenders individualize interest rates and credit limits according to assessments of customers' default risk."[42] The only distinction—that traditional lenders review credit scores and borrowers' applications to determine creditworthiness while EWA providers like MoneyLion directly review borrowers' financial accounts—is one without a difference.

74.     In addition to these loan qualification procedures, borrowers must link a bank account or debit card to their MoneyLion profile to ensure seamless repayment.

75.     Users must "agree to our Automatic Debit Authorization agreement" which "authorizes MoneyLion to debit the chosen payment method on the scheduled repayment

---

[41]     *Why Amounts and Limits May Change*, Moneylion.com, https://www.moneylion.com/resources/why-amounts-and-limits-may-change/#:~:text=Instacash%20is%20an%20optional%20service,factors%20as%20determinde%20by%20MoneyLion (last visited Mar. 17, 2025).

[42]     Matcham, *Risk-Based Borrowing Limits in Credit Card Markets* (Mar. 10, 2015), https://willmatcham.com/img/main_rbbl_matcham_2024_08_15.pdf; *see also* Dey, Mumy, *Determinants of Borrowing Limits on Credit Cards*, Fed. Reserve Bank of Boston (2006), ("Publicly available information about borrowers' creditworthiness helps banks sort their client pool into broad risk classes by way of their credit scoring systems. . . . Profit-maximizing banks choose to provide exactly the amount of credit to their borrowers that maximize their expected profits."), https://www.bostonfed.org/-/media/Documents/events/payment-choice/papers/Dey.pdf; *What are credit limits?*, Armed Forces Bank (Apr. 4, 2024) ("Financial institutions grant credit limits that allow you to use credit . . . while ensuring you can manage your payments."), https://www.afbank.com/article/what-are-credit-limits-and-how-are-they-determined.

20

date."[43] Repayments are "typically aligned with the next payday, where the advanced amount is automatically deducted from the paycheck deposited into the employee's bank account."[44]

76.     Failure to pay back an Instacash loan results in suspension of the borrower's MoneyLion account.

77.     In sum, MoneyLion's underwriting process requires, before any money changes hands, that borrowers: (1) demonstrate they are employed and regularly paid through that employment; (2) link the bank account to which paychecks are deposited to MoneyLion's app through Plaid; (3) connect at least one method of repayment (more are "highly encouraged"); (4) connect the MoneyLion application to their payroll records through Pinwheel; (5) authorize MoneyLion to automatically debit the linked accounts on the borrower's payday in an amount that is equal to the cash advance the borrower receives (the principal loan amount) plus fees and tips; and (6) be current on all prior MoneyLion Instacash loans. Borrowers who fail to complete these steps cannot obtain cash advances.

78.     Additionally, if a customer is unable to repay a loan, MoneyLion prevents them from using the product—which cash-strapped customers are usually *dependent on*—until the loan is repaid.

79.     Through these underwriting procedures and policies, MoneyLion ensures it will be able to automatically deduct the sum of the cash-advance loan amount (the loan principal), plus any additional charges, from the linked account as soon as the borrower's employer deposits the borrower's next paycheck.

---

[43] *Repaying Instacash*, help.moneylion.com, https://help.moneylion.com/en_us/repaying-instacash-BkH86xQkC (last visited Mar. 13, 2025).

[44] *What is Earned Wage Access? The Complete Guide*, MoneyLion.com, https://www.moneylion.com/learn/earned-wage-access/ (last visited Mar. 13, 2025).

21

80.     These debt collection methods are so successful that lenders recoup their advances at least 97% of the time using these tactics.[45]

**b. MoneyLion's Loans to Plaintiff**

81.     Specialist Lowe is currently an active duty servicemember in the National Guard stationed at Fort Benning in Georgia.

82.     He has been an active duty servicemember since 2008 and will remain on active duty until at least 2026.

83.     MoneyLion extended consumer credit to Plaintiff in the form of Instacash loan transactions like those discussed above.

84.     Plaintiff used the loans from MoneyLion for personal, family, or household purposes.

85.     Plaintiff paid MoneyLion's finance charges, in the form of Turbo speed fees and tips, to obtain cash-advance loans from MoneyLion,

86.     A small selection of Instacash loans made by MoneyLion to Plaintiff are shown in the below table, with the estimated cost of credit and MAPR included:

*Table 1*

| Date | Principal Amt. | Turbo Fees and/or Tips | Loan Period | APR |
|---|---|---|---|---|
| 2/10/25–2/13/25 | $100.00 | $8.99 | 3 days | 1,093% |
| 2/4/25–2/13/25 | $50.00 | $5.99 | 9 days | 486% |
| 11/27/24–12/6/24 | $100.00 | $8.99 | 9 days | 365% |
| 5/19/24–5/29/24 | $25.00 | $3.99 | 10 days | 583% |

---

[45] Devina Khanna and Arjun Kaushal, *Earned Wage Access and Direct-to-Consumer Advance Usage Trends*, Fin. Health Network (April 2021) at 2, available at https://cfsi-innovation-files-2018.s3.amazonaws.com/wp-content/uploads/2021/04/26190749/EWA_D2C_Advance-_sage_Trends_FINAL.pdf.

22

FILED: NEW YORK COUNTY CLERK 03/17/2025 05:27 PM
NYSCEF DOC. NO.

INDEX NO. 153635/2025

RECEIVED NYSCEF: 03/17/2025

Case 1:25-cv-04098    Document 1-1    Filed 05/15/25    Page 26 of 77

| 11/17/23–11/24/23 | $100.00 | $8.99 | 7 days | 469% |
|---|---|---|---|---|

87.     Specialist Lowe has received dozens of usurious loans from MoneyLion since he started using the service in 2023.

88.     The Turbo speed fees and tips are immediately and directly connected to MoneyLion's extensions of credit to Plaintiff.

89.     Further, MoneyLion's credit agreement required Specialist Lowe to purportedly waive his right to a jury trial and waive his right to participate in a class action in violation of 10 U.S.C. § 987(e)(2).

90.     MoneyLion's credit agreement also failed to include mandatory MLA loan disclosures in violation of 10 U.S.C. § 987(c) and TILA.

**c.  MoneyLion Violates the MLA and the TILA**

91.     The MLA prohibits a creditor from obligating a "Covered Member" to a loan that exceeds 36% MAPR. "The MAPR is the cost of the consumer credit expressed as an annual rate." 32 C.F.R. § 232.3. The MAPR includes "finance charges associated with the consumer credit." 32 C.F.R. § 232.4.

92.     A "Covered Member" under the statute is a "member of the armed forces who is on active duty under a call or order that does not specify a period of 30 days or less."

93.     Specialist Lowe and the MLA Class Members are subject to the protections and limitations imposed by the MLA. The MLA protects any consumer who, at the time the consumer becomes obligated on a consumer credit transaction or establishes an account for consumer credit, is a member of the armed forces or a dependent of a Covered Member (as defined in 32 CFR 232.3(g)(2) and (g)(3)).

23

94.     Specialist Lowe is a Covered Borrower with respect to his loan agreements with MoneyLion because he took out the loan while an active-duty service member for personal, family or household purposes.

95.     MoneyLion is a "creditor" subject to the requirements and limitations imposed by the MLA because it engages in the business of extending consumer credit to Covered Borrowers. 10 U.S.C. § 987(i)(5); also 32 C.F.R. § 232.3(i).

96.     The underlying loan transactions at issue in this case constitute "consumer credit" subject to the protections and limitations imposed by the MLA because they are "credit offered or extended to a Covered Borrower primarily for personal, family, or household purposes," subject to a finance charge and not subject to any statutory exception. 32 C.F.R. § 232.3(f)(1)(i); 10 U.S.C. § 987(i)(6).

97.     MoneyLion violates the MLA in at least four distinct ways: By (1) charging interest above the 36% statutory MAPR rate cap; (2) failing to provide any required MLA Disclosures; (3) including a class action and jury trial waiver which is prohibited by the MLA; and (4) including a mandatory binding arbitration clause. See, 10 U.S.C. § 987(b), (c), (e)(2), (e)(6)–(7).

98.     As a result of MoneyLion's failure to provide substantially any of the disclosures required by TILA, MoneyLion also violates 15 U.S.C. § 1638.

## VI.     TOLLING

99.     The Servicemember Civil Relief Act ("SCRA"), 50 U.S.C. §§ 3901 et seq., tolls any and all limitations or repose periods for all active-duty military members, including those similarly situated to Specialist Lowe, until their active-duty service concludes. Specifically, § 3936(a) of the SCRA provides:

> The period of a servicemember's military service may not be included in computing any period limited by law, regulation, or order for the bringing of

FILED: NEW YORK COUNTY CLERK 03/17/2025 05:27 PM
NYSCEF DOC. NO.

INDEX NO. 153635/2025
RECEIVED NYSCEF: 03/17/2025

Case 1:25-cv-04098    Document 1-1    Filed 05/15/25    Page 28 of 77

any action or proceeding in a court, or in any board, bureau, commission, department, or other agency of a State (or political subdivision of a State) or the United States by or against the servicemember or the servicemember's heirs, executors, administrators, or assigns.

## VII.    CLASS ALLEGATIONS

100.    Specialist Lowe seeks to represent two classes of individuals pursuant to NY CPLR § 901 (2015), *et seq.*

101.    Specialist Lowe seeks to represent the "MLA Class" and the "TILA Class" (collectively the "Classes"). Specialist Lowe brings this action individually and on behalf of classes of which he is a member and initially defined:

> **MLA Class**: All Covered Members and dependents of Covered Members who entered into an agreement with MoneyLion to use its "Instacash" product, in which MoneyLion was paid a finance charge (including, without limitation, a turbo speed fee or tip).

> **TILA Class**: All individuals in the United States that entered into an agreement with MoneyLion to use its "Instacash" product, in which MoneyLion was paid a finance charge (including, without limitation, a turbo speed fee or tip).

102.    Expressly excluded from the Classes are: (a) any Judge presiding over this action and members of their families; (b) MoneyLion and any entity in which MoneyLion has a controlling interest, or which has a controlling interest in MoneyLion, and its legal representatives, assigns and successors; and (c) all persons who properly execute and file a timely request for exclusion from the Classes.

103.    Specialist Lowe reserves the right to amend the Class definitions if further investigation and discovery indicates that the Class definitions should be narrowed, expanded, or otherwise modified.

104.    **Numerosity**. MoneyLion's scheme has harmed and continues to harm the members of the Classes. The members of the proposed Classes are so numerous that joinder of all members is impracticable.

25

105. The exact number of Class members is unknown, but MoneyLion has made millions of loans, and Specialist Lowe estimates there are, at least many thousands of consumers in the MLA Class and TILA Class as MoneyLion has issued thousands of loans to members of the Classes in a manner that violates the MLA and TILA.

106. **Commonality**. Common questions of law and fact affect the right of each Class member and common relief by way of damages is sought for Specialist Lowe and Class members.

107. The harm that MoneyLion has caused or could cause is substantially uniform with respect to Class members. Common questions of law and fact that affect the Class members include, but are not limited to:

a. Whether Specialist Lowe and the MLA Class members are Covered Borrowers subject to the protections and limitations of the MLA;

b. Whether MoneyLion is a "creditor" subject to the protections and limitations of the MLA;

c. Whether MoneyLion's loans constitute an extension of "consumer credit" subject to the protections and limitations of the MLA and TILA;

d. Whether MoneyLion entered into standard form loan agreements with Covered Borrowers;

e. Whether MoneyLion's loans exceed the MLA statutory rate cap of 36% MAPR;

f. Whether MoneyLion failed to provide required MLA disclosure in violation of the MLA;

g. Whether MoneyLion's standard form loan agreements contain a class action waiver provision or jury trial waiver provision in violation of the MLA;

26

h.  Whether MoneyLion's standard form loan agreements contain an arbitration clause in violation of the MLA;

i.  Whether MoneyLion failed to provide required credit disclosures in violation of the MLA and TILA;

j.  Whether each month MoneyLion charged interest to Specialist Lowe and Class Members it restarted the statute of limitations under the MLA;

k.  Whether each month that Specialist Lowe and the Class Members paid money to MoneyLion it restarted the statute of limitations under the MLA;

l.  Whether Class members are entitled to actual or statutory damages for the aforementioned violations and, if so, in what amounts;

m.  Whether MoneyLion should be enjoined from continuing its lending practices in the manner challenged herein;

n.  Whether MoneyLion is subject to punitive damages, and, if so, the proper measure of such damages and remedies to which Specialist Lowe and the Class are entitled under 10 U.S.C. § 987(f)(5); and

o.  Any declaratory and/or injunctive relief to which the Classes are entitled.

108.  **Typicality**. The claims and defenses of Specialist Lowe are typical of the claims and defenses of the MLA Class because Specialist Lowe is a Covered Borrower and his loan agreements with MoneyLion are typical of the type of personal, household, or family loans that MoneyLion normally provides to Covered Borrowers. Additionally, MoneyLion uses the same or substantially similar standard form loan agreement in all of its lending transactions. The documents involved in the transaction were standard form documents and the violations are statutory in nature. Specialist Lowe suffered damages of the same type and in the same

27

manner as the Classes he seeks to represent. There is nothing peculiar about the Plaintiff's claims.

109. **Adequacy**. Specialist Lowe will fairly and adequately assert and protect the interests of the Classes. Specialist Lowe has hired attorneys who are experienced in prosecuting class action claims and will adequately represent the interests of the Classes, and Specialist Lowe has no conflict of interest that will interfere with maintenance of this class action.

110. **Predominance**. The previously articulated common issues of fact and law predominate over any question solely affecting individual Class Members. Resolution of the common issues in this litigation will resolve virtually the entirety of every Class Members' claims in a single stroke. There are no significant individual questions of liability or damages whatsoever, and certainly not ones that predominate over issues common to the Classes. Thus, predominance within the meaning of Rule 23(b)(3) is established.

111. **Superiority**. A class action provides a fair and efficient method for the adjudication of this controversy. There are no unusual legal or factual issues that would create manageability problems; Prosecution of thousands of separate actions by individual members of the Classes would create a risk of inconsistent and varying adjudications against MoneyLion and could create incompatible standards of conduct; Adjudications with respect to individual members of the Classes could, as a practical matter, be dispositive of any interest of other members not parties to such adjudications, or substantially impair their ability to protect their interests; and the claims of the individual Class members are small in relation to the expenses of litigation, making a class action the only procedural method of redress in which Class members can, as a practical matter, vindicate their legal claims and enforce their statutory rights.

28

Case 1:25-cv-04098    Document 1-1    Filed 05/15/25    Page 32 of 77

112.    MoneyLion has acted and refused to act on grounds generally applicable to the Classes, thereby making declaratory relief and corresponding final injunctive relief under the California Rules of Civil Procedure appropriate with respect to the Classes. MoneyLion should be enjoined from making loans to Covered Borrowers in violation of the MLA and TILA and a declaration should be made that the loans are void from inception.

### VIII.    CLAIMS FOR RELIEF

### COUNT I
### VIOLATIONS OF MILITARY LENDING ACT

113.    Specialist Lowe brings this claim on behalf of himself and the MLA Class and incorporates paragraphs 1–112 by reference.

114.    The MLA prohibits a creditor from obligating a "Covered Member" or dependent of a Covered Member (collectively, "Covered Borrowers") to a loan in excess of 36% MAPR.

115.    A "Covered Member" in the statute is a "member of the armed forces who is on active duty under a call or order that does not specify a period of 30 days or less."

116.    "The MAPR is the cost of the consumer credit expressed as an annual rate." 32 C.F.R. § 232.3. The MAPR includes as relevant here, "finance charges associated with the consumer credit." 32 C.F.R. § 232.4.

117.    Specialist Lowe and the MLA Class Members are "Covered Borrowers," subject to the protections and limitations imposed by the MLA. A Covered Borrower is a consumer who, at the time the consumer becomes obligated on a consumer credit transaction or establishes an account for consumer credit, is a Covered Member of the armed forces or a dependent of a Covered Member (as defined in 32 CFR 232.3(g)(2) and (g)(3)).

29

118. Specialist Lowe is considered a "Covered Borrower" with respect to his MoneyLion loan agreements because Specialist Lowe is an active duty service member who is obligated by law to repay loans he took out for personal, family or household purposes.

119. MoneyLion is a "creditor" subject to the requirements and limitations imposed by the MLA in that it engages in the business of extending consumer credit to Covered Borrowers protected by the MLA. 10 U.S.C. § 987(i)(5); also 32 C.F.R. § 232.3(i).

120. The underlying loan transactions at issue in this case constitute "consumer credit" subject to the protections and limitations imposed by the MLA because they are "credit offered or extended to a Covered Borrower primarily for personal, family, or household purposes," subject to a finance charge and outside the ambit of any of the identified exceptions. 32 C.F.R. § 232.3(f)(1)(i); also 10 U.S.C. § 987(i)(6).

121. MoneyLion charged Specialist Lowe and the MLA class well above the 36% interest rate cap on their loans, in violation of the MLA.

122. MoneyLion fails to make all the disclosures required by 10 U.S.C. § 987(c)(1)(A) and 32 C.F.R. § 232.6 in its standard form loan agreements, in violation of the MLA.

123. MoneyLion's standard form loan agreements include mandatory arbitration agreements in violation of 10 U.S.C. § 987(e)(3).

124. MoneyLion's standard form loan agreements include class action waivers trial waivers in violation of 10 U.S.C. § 987(e)(2).

125. As a result, MoneyLion violates 10 U.S.C. § 987.

### COUNT II
### VIOLATIONS OF THE TRUTH IN LENDING ACT

126. Specialist Lowe brings this claim on behalf of himself and the TILA Class and incorporates paragraphs 1–112 by reference.

30

127.    TILA and Regulation Z require creditors to provide consumers with specified disclosures for closed-end credit transactions. 15 U.S.C. § 1638; 12 C.F.R. §§ 1026.17, 1026.18. MoneyLion's loan agreements are closed-end credit transactions because they are not open-end credit transactions. Open-end credit transactions are "a plan under which the creditor reasonably contemplates repeated transactions, which prescribes the terms of such transactions, and which provides for a finance charge which may be computed from time to time on the outstanding unpaid balance." 15 U.S.C. § 1602.

128.    Among other requirements, the Regulation prescribes the format of the disclosures, as well as disclosure of certain terms themselves, such as the annual percentage rate and finance charge. 12 C.F.R. §§ 1026.17, 1026.18.

129.    MoneyLion is a creditor whose financing qualifies as "credit" under TILA and Regulation Z, and its loan agreements with consumers are therefore subject to TILA and Regulation Z's disclosure requirements. See 12 C.F.R. § 1026.2(a)(14).

130.    MoneyLion has not provided such disclosures before consummation of the loan agreements.

131.    MoneyLion failed to provide such disclosures to Specialist Lowe and the TILA Class.

132.    As a result, MoneyLion violated TILA and Regulation Z. 15 U.S.C. § 1638; 12 C.F.R. §§ 1026.17 & 1026.18.

## **PRAYER FOR RELIEF**

WHEREFORE, Specialist Lowe prays that the Court enter an Order:

    A. Certifying this action as a class action as provided by Fed. R. Civ. P. 23, appointing Specialist Lowe as Class Representative, and appointing undersigned attorneys and their firms as Class Counsel;

31

B. Declaring that MoneyLion violated the MLA and adjudging that Specialist Lowe and MLA Class Members' standard form loan agreements violate the MLA;

C. Adjudging that MoneyLion violated the MLA and awarding Specialist Lowe and MLA Class Members actual damages of not less than $500 per violation pursuant to 10 U.S.C. § 987(f)(5)(A)(i);

D. Adjudging that MoneyLion violated TILA and awarding Specialist Lowe and the TILA Class actual damages and statutory damages pursuant to 15 U.S.C. § 1640;

E. Adjudging that MoneyLion violated the MLA and award Specialist Lowe and MLA Class Members punitive damages pursuant to 10 U.S.C. § 987(f)(5)(A)(ii);

F. Awarding Specialist Lowe and the Classes, reasonable attorneys' fees and costs incurred in this action;

G. Enjoining MoneyLion from continuing to engage in predatory lending practices in violation of the MLA and TILA;

H. Awarding Specialist Lowe, and the MLA Class, any pre-judgment and post judgment interest as may be allowed under the law; and

I. Awarding such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMAND

Specialist Lowe demands a jury trial on all issues so triable.

Dated: March 17, 2025            Respectfully submitted,

By: /s/

32

THE LAW OFFICE OF THOMAS M. MULLANEY
Thomas M. Mullaney
530 Fifth Avenue
23rd Floor
New York, NY 10036
Telephone: (212) 223-0800
Email: tmm@mullaw.org

CARNEY BATES & PULLIAM, PLLC
Randall K. Pulliam (*pro hac vice* forthcoming)
Edwin Lee Lowther III (*pro hac vice* forthcoming)
Courtney Ross Brown (*pro hac vice* forthcoming)
One Allied Drive, Suite 1400
Little Rock, AR, 72202
Telephone: (501) 312-8500
Email: rpulliam@cbplaw.com
Email: llowther@cbplaw.com
Email: cbrown@cbplaw.com

JACOBSON PHILLIPS PLLC
Jacob L. Phillips (pro hac vice forthcoming)
Joshua R. Jacobson (pro hac vice forthcoming)
478 E. Altamonte Dr.
Ste 108-570
Altamonte Springs, FL 32701
Telephone: (407) 720-4057
Email: jacob@jacobsonphillips.com
Email: joshua@jacobsonphillips.com

33

Wolters Kluwer

**CT Corporation**
**Service of Process Notification**
04/15/2025
CT Log Number 548894151

## Service of Process Transmittal Summary

**TO:**    LEGAL TEAM
MONEYLION TECHNOLOGIES INC.
249 W 17TH ST FL 4
NEW YORK, NY 10011-5390

**RE:**    **Process Served in New York**

**FOR:**    MONEYLION TECHNOLOGIES INC.  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | JAMES LOWE, individually, and on behalf of all others similarly situated vs. MONEYLION TECHNOLOGIES, INC. |
| **CASE #:** | 1536352025 |
| **PROCESS SERVED ON:** | National Registered Agents, Inc., New York, NY |
| **DATE/METHOD OF SERVICE:** | By Process Server on 04/15/2025 at 12:27 |
| **JURISDICTION SERVED:** | New York |
| **ACTION ITEMS:** | CT will retain the current log |
| | Image SOP |
| | Email Notification,  LEGAL TEAM  legal@moneylion.com |
| **REGISTERED AGENT CONTACT:** | National Registered Agents, Inc. |
| | 28 Liberty Street |
| | New York, NY 10005 |
| | 866-401-8252 |
| | LargeCorporationTeam@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.



# PROCESS SERVER DELIVERY DETAILS

**Date:**                           Tue, Apr 15, 2025
**Server Name:**                    juan pimentel

| Entity Served | MoneyLion Technologies Inc |
|---|---|
| Case Number | 153635 2025 |
| Jurisdiction | NY |

| Inserts |
|---|
|   |



**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF** NEW YORK
-----------------------------------------------------------------x
JAMES LOWE, individually, and on behalf of all others
similarly situated,

Plaintiff/Petitioner,

- against -                                    Index No. 153635/2025

MONEYLION TECHNOLOGIES, INC. d/b/a
MONEYLION

Defendant/Respondent.

-----------------------------------------------------------------x

**NOTICE OF ELECTRONIC FILING**
**(Mandatory Case)**
(Uniform Rule § 202.5-bb)

**You have received this Notice because**:

> 1) The Plaintiff/Petitioner, whose name is listed above, has filed this case using the New York State Courts E-filing system ("NYSCEF"), and

> 2) You are a Defendant/Respondent (a party) in this case.

- **If you are represented by an attorney**:
  Give this Notice to your attorney. (Attorneys: see "Information for Attorneys" pg. 2).

- **If you are not represented by an attorney**:
  **You will be served with all documents in paper and you must serve and file your documents in paper, unless you choose to participate in e-filing.**

  **If you choose to participate in e-filing, you must have access to a computer and a scanner or other device to convert documents into electronic format, a connection to the internet, and an e-mail address to receive service of documents.**

The **benefits of participating in e-filing** include:

- serving and filing your documents electronically

- free access to view and print your e-filed documents

- limiting your number of trips to the courthouse

- paying any court fees on-line (credit card needed)

**To register for e-filing or for more information about how e-filing works:**

- visit: www.nycourts.gov/efile-unrepresented or
- contact the Clerk's Office or Help Center at the court where the case was filed. Court contact information can be found at www.nycourts.gov

To find legal information to help you represent yourself visit www.nycourthelp.gov

**Information for Attorneys**
**(E-filing is Mandatory for Attorneys)**

An attorney representing a party who is served with this notice must either:

1) immediately record his or her representation within the e-filed matter on the NYSCEF site www.nycourts.gov/efile ; or

2) file the Notice of Opt-Out form with the clerk of the court where this action is pending and serve on all parties. Exemptions from mandatory e-filing are limited to attorneys who certify in good faith that they lack the computer hardware and/or scanner and/or internet connection or that they lack (along with all employees subject to their direction) the knowledge to operate such equipment. [Section 202.5-bb(e)]

For additional information about electronic filing and to create a NYSCEF account, visit the NYSCEF website at www.nycourts.gov/efile or contact the NYSCEF Resource Center (phone: 646-386-3033; e-mail: nyscef@nycourts.gov).

Dated:  March 27, 2025

Thomas M. Mullaney                              530 Fifth Ave, 23rd Floor
Name                                                Address
The Law Office of Thomas M. Mullaney
                                                   New York, New York 10036
Firm Name

                                                   212.223.0800
                                                        Phone

                                                   tmm@mullaw.org
                                                        E-Mail

To:   MoneyLion Technologies, Inc.

      249 W 17th St floor 4

      New York, NY 10011

Case 1:25-cv-04098    Document 1-1    Filed 05/15/25    Page 41 of 77

## SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF NEW YORK

| | |
|---|---|
| **JAMES LOWE, individually, and on behalf of all others similarly situated,** | |
| **Plaintiff,** | CASE NO.: |
| **v.** | |
| **MONEYLION TECHNOLOGIES, INC., d/b/a MONEYLION,** | **DEMAND FOR JURY TRIAL** |
| **Defendant.** | |

### CLASS ACTION SUMMONS

Plaintiff designates NEW YORK COUNTY as the place of trial. The basis of venue is the defendants' residences. Defendant MONEYLION TECHNOLOGIES, INC. and its subsidiary ML Plus, LLC are located at 249 W. 17th Street, Floor 4, New York, NY 10011 .

*To the above-named Defendant:*

**YOU ARE HEREBY SUMMONED** and required to serve upon THOMAS M. MULLANEY, ESQ., whose address is 530 Fifth Avenue, 23RD Floor, New York, New York, 10036, an answer to the complaint which is herewith served upon you, within twenty (20) days after service of this summons upon you, if served upon you personally within the State of New York, or within thirty (30) days if served upon you outside of the State of New York and/or by other than personal means. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

FILED: NEW YORK COUNTY CLERK 03/17/2025 05:27 PM    INDEX NO. 153635/2025

NYSCEF DOC. NO. 1    RECEIVED NYSCEF: 03/20/2025

/s/_____
Thomas M. Mullaney
Attorney for Plaintiff

Dated:  New York, New York
        March 17, 2025

Case 1:25-cv-04000   Document 1-1   Filed 05/15/25   Page 43 of 77

## SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF NEW YORK

| | |
|---|---|
| **JAMES LOWE, individually, and on behalf of all others similarly situated,** | |
| **Plaintiff,** | CASE NO.: |
| **v.** | **CLASS ACTION** |
| **MONEYLION TECHNOLOGIES, INC., d/b/a MONEYLION,** | **DEMAND FOR JURY TRIAL** |
| **Defendant.** | |

## CLASS ACTION COMPLAINT

Plaintiff James Lowe, on behalf of himself and all others similarly situated, alleges the following based upon personal knowledge as to himself and upon information and belief and the investigation of his counsel as to all other matters, and brings this Class Action Complaint against MoneyLion Technologies, Inc. (D/B/A MoneyLion) (collectively, "MoneyLion" or "Defendant") and alleges as follows:

### I.    NATURE OF THE ACTION

1.      This Complaint seeks to protect active-duty military service members from MoneyLion's predatory lending practices that violate the Military Lending Act, 10 U.S.C. § 987, *et seq.* ("MLA") and the Truth in Lending Act, 15 U.S.C. § 1638 ("TILA"). The MLA was enacted to protect United States active-duty service members and their dependents (collectively, "Covered Borrowers") from predatory lending. Excessive debt endangers our nation's military readiness and is detrimental to service-member retention, morale, household stability, security clearances, and career advancement. Notably here, MoneyLion makes no

1

effort to fulfill its duty to determine whether it is lending to Covered Borrowers or to provide legally mandated protections for them.

2.  MoneyLion is in the business of payday lending through an earned wage access ("EWA") product—it makes funds available to its customers, who repay MoneyLion principal and finance charges (including expedite fees and so-called "tips") on payday. Its business model entails making high-frequency, short-term, and high-cost loans to consumers living paycheck to paycheck. Despite advertising its loans as having "no interest," in practice, MoneyLion takes in *triple* and sometimes *quadruple* digit finance charges from its customers. Defendant issued Plaintiff many stratospherically expensive loans, with at least one such loan exceeding **1,090%** military APR. The end result is a financial product that extracts exorbitant fees from workers, encourages serial usage and dependance on the costly loans, worsens workers' financial circumstances, and traps them in a cycle of debt.

3.  Plaintiff, a Specialist, has used MoneyLion's "Instacash" product for years. By virtue of, *inter alia*, the sky-high fees charged for early access to his salary, MoneyLion has extended consumer credit to Plaintiff on numerous occasions in violation of the MLA and TILA.

4.  Borrowing money that is repaid on payday is not an innovation; it is a loan. As EWA products have become more popular, the parallels to payday lending are striking. Like payday loans, EWA products can trap users in a cycle of reborrowing that increases their financial distress, all in service of generating revenue for predatory lenders. Considering the substance of the transactions, Defendant's "Instacash" transactions are in reality extensions of consumer credit.

2

5.     In violation of the MLA, Defendant uses its Instacash product to saddle Covered Members with charges that yield a military annual percentage rate ("MAPR") well in excess of the MLA's legal limit.

6.     MoneyLion's consumer credit agreements violate the MLA in at least four ways: By (1) charging interest above the 36% statutory MAPR cap; (2) failing to provide any required MLA Disclosures; (3) including a class action and jury trial waiver; and (4) including a mandatory binding arbitration clause. 10 U.S.C. § 987(b), (c) & (e)(1)(2)(5)(6).

7.     MoneyLion systematically violates the Truth in Lending Act by failing to make required disclosures concerning the interest rate charged as part of its loan agreements with consumers.

8.     Among the abusive lending practices the MLA is designed to curb is predatory payday loans made to servicemembers.[1] In a Department of Defense report on predatory lending practices affecting military members (the "Report"), the egregious lending practices prevalent in the payday lending industry are highlighted.[2] The Report notes that payday lenders are "heavily concentrated around military bases," with statistics showing that communities with military installations "rank among the most heavily targeted communities in their respective states."[3] Military populations are targeted for an obvious reason: "active-duty military personnel are three times more likely than civilians to have taken out a payday loan," with such loans costing servicemembers over $80 million in abusive fees annually as of 2005.[4]

---

[1] *Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents*, U.S. DEP'T OF DEFENSE (Aug. 9, 2006), available at https://apps.dtic.mil/sti/pdfs/ADA521462.pdf.
[2] *Id.* at 10–16.
[3] *Id.* at 10–11.
[4] *Id.* at 11.

3

9.      MoneyLion's business practices violate the MLA and TILA and are part of a systematic nationwide policy and practice. Plaintiff Lowe seeks to hold Defendant accountable for its actions and prevent its predatory lending practices from continuing.

## II.  PARTIES

10.     At all times relevant, Specialist Lowe has been a resident of Georgia. He has been a member of the National Guard since 2008 and is currently a machine mechanic stationed at Fort Benning in Georgia.

11.     During the class period, Specialist Lowe has been a Covered Borrower and an active-duty service member employed by the Army National Guard.

12.     MoneyLion Technologies Inc. (known until September 2021 as MoneyLion Inc.) is a Delaware corporation headquartered in New York, New York. Through its digital-technology platform, including its website and mobile app, MoneyLion has offered, brokered, and extended online installment loans, engaged in the servicing and collections of such loans, and provided other financial products and services to consumers, as described below.

13.     MoneyLion has offered loan agreements to consumers, including Covered Borrowers, since at least 2013, entering into millions of credit transactions.

## III.  JURISDICTION AND VENUE

14.     This Court has personal jurisdiction over Defendant because Defendant conducts business in this State and keeps its headquarters in New York, New York.

15.     Additionally, the terms of service for MoneyLion's Instacash product provide for exclusive jurisdiction New York County, New York.[5] Jurisdiction and venue are therefore proper in this Court.

---

[5] "Any dispute that is not subject to arbitration . . . shall be brought in the appropriate state or federal court located in New York County, New York." MoneyLion, *MoneyLion Terms of Service*, https://www.moneylion.com/terms-and-conditions/#ml-instacash (last visited Mar. 13, 2025).

4

Case 1:25-cv-04000   Document 1-1   Filed 05/15/25   Page 47 of 73

## IV.    LEGAL BACKGROUND

### a.    The MLA Was Specifically Designed to Curb Predatory Payday Loans to Covered Members

16.    The DoD's Report on lending practices discussed the payday lending industry at length.[6] The Report noted that payday lenders were "heavily concentrated around military bases," with statistics showing that communities with military installations "rank among the most heavily targeted communities in their respective states."[7]

17.    Military populations were targeted for an obvious reason: "active-duty military personnel are three times more likely than civilians to have taken out a payday loan," with such loans costing servicemembers millions in abusive fees.[8] Moreover, the military payment architecture, and the Uniform Code of Military Justice to which servicemembers are bound, make them particularly vulnerable to predatory payday loans:

> Check-holding, a central feature of payday loans, is particularly risky for military borrowers. Every payday loan involves a prospective "bad" check. Military borrowers are required to maintain bank accounts in order to receive direct deposit of military pay and are subject to the Uniform Code of Military Justice that penalizes deliberately writing a check not covered by funds on deposit. Borrowers become trapped in repeat borrowing or renewals of loans in order to keep the check used to obtain the loan from bouncing, a key reason that payday loans are debt traps.[9]

18.    While the precise EWA product offering was developed somewhat recently, its genre (small-dollar, short-duration, high-cost loans) is nothing new. In 2006, the DoD noted military "borrowers encounter[ed] a booming virtual market of small loan offers, payday loans,

---

[6] Report, *supra* n.1.
[7] *Id.* at 10–11.
[8] *Id.* at 11.
[9] *Id.* at 14. To be sure, EWA providers like MoneyLion do not collect physical checks from their customers at loan initiation but instead take a virtual check by requiring Covered Members to authorize automatic debits from bank accounts to repay their loans.

5

and 'military loans' via the Internet."[10] Those loans, like MoneyLion's, "are delivered and collected online through electronic fund transfer."[11]

19.     The Report noted key similarities between the various predatory lending products—including payday loans and internet loans—that target the military, which accurately encapsulate MoneyLion's business model:

> (1) Predatory lenders seek out young and financially inexperienced borrowers who have bank accounts and steady jobs, but also have little in savings, flawed credit or have hit their credit limit. These borrowers are less likely to weigh the predatory loan against other opportunities and are less likely to be concerned about the consequences of taking the loan.
>
> (2) Predatory lenders make loans based on access to assets (through checks, bank accounts, car titles, tax refunds, etc.) and guaranteed continued income, but not on the ability of the borrower to repay the loan without experiencing further financial problems.[12]
>
> (3) . . . Increasingly the Internet is used to promote loans to Service members.
>
> (4) Predatory products feature high fees/interest rates, with some requiring balloon payments, while others pack excessive charges into the product. The result of their efforts is to obfuscate the comparative cost of their product with other options available to the borrower.
>
> . . .
>
> (6) Predatory lenders attempt to work outside of established usury limits, either by attempting to obtain exemptions from federal and state statutes or by developing schemes designed to circumvent existing laws.[13]

20.     The Report further found "high interest loans, whether provided as a payday loan, military installment loan, or as a result of unscrupulous automobile financing can leave a Service member with enormous debt, family problems, difficulty maintaining personal

---

[10] *Id.* at 15.
[11] *Id.* at 16.
[12] To that end, lenders' "use of checks, access to bank accounts, [and similar other methods of extracting repayment] pressure the borrow to consider loan payments as being their top priority." *Id.* at 44.
[13] *Id.* at 21–22.

6

readiness and a tarnished career."[14] As if being trapped in a debt cycle is not bad enough, some servicemember victims of payday and other lenders experienced disciplinary action (ranging from reprimands to "loss of promotions and separation from the military") as a result of their financial hardship.[15]

21.     Drawing from the bountiful evidence of servicemember abuse at the hands of predatory lenders, the DoD concluded it could not "prevent predatory lending without assistance from Congress, the state legislatures, and federal and state enforcement agencies."[16]

22.     To curb usurious interest rates, excessive annual percentage rates (APRs), and bogus fees, the DoD requested legislation that would prevent lenders from preying on service members and endangering the nation's military readiness.[17]

23.     The American Bar Association and Navy-Marine Corps Relief Society likewise submitted letters in support of the DoD's request, noting the "urgent need for remedial Congressional action" to curb predatory loan practices harming Service members.[18]

24.     Congress answered the call and passed the MLA to protect Covered Borrowers from unfair, deceptive, and excessively priced loans.

**b.      The Military Lending Act**

25.     In the wake of the DoD's investigations, in 2006, the Military Lending Act, 10 U.S.C. § 987 *et seq.*, was enacted.

---

[14] *Id.* at 39.
[15] *Id.* at 41–42.
[16] *Id.* at 46.
[17] Specifically, the DoD requested legislation protecting Service members "from unfair, deceptive lending practices and usurious interest rates and to require uniform disclosure of credit and terms. Specifically, lenders should not be permitted to base loans on prospective bad checks, electronic access to bank accounts, mandatory military allotments, or titles to vehicles. All costs involved in borrowing should be included in interest rate calculations and disclosures. Laws and regulations must be changed to close regulatory loopholes that leave non-resident military borrowers unprotected in many states." *Id.*
[18] *Id.* at 54–56.

26.     The MLA makes it unlawful for a creditor to "impose an annual percentage rate of interest greater than 36 percent with respect to the consumer credit extended to a Covered Member or a dependent of a Covered Member." 10 U.S.C. § 987(b).

27.     The MLA also requires mandatory disclosures in "consumer credit"[19] transactions with Covered Borrowers, which include:

- A statement of the annual percentage rate of interest applicable to the extension of credit, 10 U.S.C. § 987(c)(1)(A);

- Any disclosures required under the Truth in Lending Act, 10 U.S.C. § 987(c)(1)(B); and

- A clear description of the payment obligations of the member or dependent, as applicable, 10 U.S.C. § 987(c)(1)(C).

28.     Additionally, the MLA prohibits creditors from including provisions in a consumer-credit transaction that require the Covered Borrow to submit to arbitration or to waive the borrower's right to legal recourse. 10 U.S.C. § 987(e).

29.     The MLA also makes it unlawful to charge a Covered Borrower any penalty or fee for prepaying all or part of the loan. 10 U.S.C. § 987(e).

**c.      The Truth in Lending Act**

30.     The Truth in Lending Act, codified at 15 U.S.C. § 1638, protects consumers by, *inter alia*, (i) requiring lenders to clearly disclose all terms and costs associated with loans, (ii) allowing borrowers to easily compare different credit options, and (iii) preventing predatory lending practices by making loan details transparent and standardized. In essence, TILA promotes informed use of consumer credit by providing full disclosure of loan terms.

---

[19] Under the MLA, consumer credit is defined as "credit offered or extended to a Covered Borrower primarily for personal, family, or household purposes," subject to a finance charge or payable by written agreement in more than four installments and outside the ambit of any of the identified exceptions.

8

Case 1:25-cv-04098    Document 1-1    Filed 05/15/25    Page 51 of 77

31.    Under TILA, creditors are required to make certain disclosures when participating in closed-end credit transactions, such as those MoneyLion offers here. MoneyLion fails to make any of the following required disclosures:

- "The 'amount financed', using that term, which shall be the amount of credit of which the consumer has actual use," 15 U.S.C. § 1638(2)(A);

- "a statement of the consumer's right to obtain, upon a written request, a written itemization of the amount financed," *id.* at § 1638(2)(B);

- "The 'finance charge', not itemized, using that term," *id.* at § 1638(3);

- "The finance charge expressed as an 'annual percentage rate', using that term," *id.* at § 1638(4);

- "The number, amount, and due dates or period of payments scheduled to repay the total of payments," *id.* at § 1638(6);

- "Descriptive explanations of the terms 'amount financed', 'finance charge', 'annual percentage rate', 'total of payments', and 'total sale price' as specified by the Bureau," *id.* at § 1638(8);

- "Where the credit is secured, a statement that a security interest has been taken in (A) the property which is purchased as part of the credit transaction, or (B) property not purchased as part of the credit transaction identified by item or type," *id.* at § 1638(9);

- "A statement indicating whether or not the consumer is entitled to a rebate of any finance charge upon refinancing or prepayment in full pursuant to acceleration or otherwise, if the obligation involves a precomputed finance charge," *id.* at § 1638(11); and

9

- "A statement that the consumer should refer to the appropriate contract document for any information such document provides about nonpayment, default, the right to accelerate the maturity of the debt, and prepayment rebates and penalties," *id.* at § 1638(12).

## V.     FACTS

**a.     The Earned Wage Product Market and MoneyLion**

       **i.     EWA Products Charge High Fees and Wreak Havoc on Borrowers' Financial Health**

32.     A significant driver of demand for consumer credit and financial products stems from the mismatch between when a family receives income and when they pay expenses. Employees generally provide services before being paid for their labor and are typically paid in arrears on a biweekly or semi-monthly cycle. To meet liquidity challenges, consumers have for years turned to credit cards, personal installment loans, and payday loans.

33.     Recently, an old product with new packaging—coined "earned wage access" or "earned wage advance" ("EWA")—was created and offered to consumers to address the same need. While marketed as a novel financial technology ("fintech") device, in practice, EWA products are garden variety cash advances.

34.     EWA products provide workers, before their payday, with a portion of their earned but unpaid wages or to funds that purport to equal or approximate a portion of their unpaid wages. Loaned funds are repaid via automated withdrawal from the consumer's bank account.

35.     Defendant MoneyLion is one of the fintech companies that provides an EWA product, which it calls "Instacash." "Instacash provides cash advance(s) to you from time to

10

time, in MoneyLion's sole discretion, based on your anticipated recurring direct deposits (each such advance, an '**Instacash Advance**')."[20]

36.     To repay these loans, users must authorize MoneyLion to charge their debit card or initiate an electronic fund transfer from a bank account.[21] For users who have provided more than a single payment method (*i.e.*, a debit card *and* bank account) and have insufficient money in their primary payment account to payoff an Instacash loan, MoneyLion requires users to authorize MoneyLion to "debit your backup payment method for the remaining amount to be repaid."[22]

37.     EWA providers advertise their products as "free" or "no interest" while obscuring the ways in which they bilk consumers for fees and other finance charges that add up to loan-shark rates.

38.     EWA providers, including MoneyLion, are generally paid through two types of fees: (1) expedite fees, and (2) through so-called "tips."

39.     First, **expedite fees** (referred to by MoneyLion as "Turbo delivery fees") are charged to provide instant access to loan funds. For "Instacash" advances to external bank accounts, MoneyLion charges:

- $1.99 for instant access to loans of $5 or less;
- $3.99 for loans between $10 and $25;
- $4.99 for loans between $30 and $45;
- $5.99 for loans between $50 and $65;
- $7.49 for loans between $70 and $85; and
- $8.99 for loans between $90 and $100.

---

[20] *MoneyLion Instacash Terms and Conditions*, MONEYLION, https://www.moneylion.com/terms-and-conditions/#ml-instacash (updated as of Dec. 2024).
[21] *Id.*; *see also MoneyLion Instacash*, https://www.moneylion.com/cash-advance/instacash (last visited Mar. 13, 2025) ("Instacash repayments are automated, making it easy to pay on your scheduled repayment date and replenish your Instacash so it's ready when you need it next! On each scheduled repayment date, the amount of Instacash you received and any related optional Tips and optional Turbo Fees will be automatically deducted from your authorized payment account or debit card.").
[22] *Id.*

11

Case 1:25-cv-04098    Document 1-1    Filed 05/15/25    Page 54 of 77

40.     The actual cost to provide customers with instant access to funds is less than $0.05.[23]

41.     The speed of access to funds is an essential and defining aspect of EWA products. They are designed to address—and marketed as addressing—what is generally a less-than two-week liquidity problem.

42.     MoneyLion's website includes numerous representations about the speed of access to funds, like "Get Cash Today" and "Available in minutes"

43.     While expedite fees are notionally optional and users can use an EWA product without paying one, they are difficult to access and negate their usefulness to consumers. For instance, the free, non-expedited version of a MoneyLion cash advance "will typically be available in your [bank account] between one (1) and five (5) business days from the date of your request."[24] Conversely, the expedited service takes just a few minutes. This delay is problematic for MoneyLion's intended users, consumers living paycheck to paycheck who turn to EWA providers for the precise reason that their need for cash is urgent and cannot wait.

44.     Indeed, a recent study found that the average loan term for EWA loans was only ten days.[25] Consumers who cannot wait ten days to access their wages certainly will pay whatever fees an EWA provider charges to obtain their funds as quickly as possible. As a result, the vast majority of EWA users pay expedite fees to obtain immediate funds disbursement.[26]

_____

[23] *Simple, Transparent, Uniform Pricing for All Financial Institutions*, THE CLEARINGHOUSE (showing cost of RTP instant credit transfer at $0.045), available at https://www.theclearinghouse.org/-/media/new/tch/documents/payment-systems/rtp_-pricing_02-07-2019.pdf.
[24] *MoneyLion Instacash Terms and Conditions*, MONEYLION, https://www.moneylion.com/terms-and-conditions/#ml-instacash (updated as of Dec. 2024).
[25] Lucia Constantine, Christelle Bamona, Sara Weiss, *Not Free: The Large Hidden Costs of Small-Dollar Loans Made Through Cash Advance Apps*, CTR. FOR RESPONSIBLE LENDING, at 10 (Apr. 2024) (hereinafter "*Not Free*").
[26] One recent survey found 79% of EWA users typically paid expedite fees to receive funds faster. *Not Free*, at 3. Likewise, the Consumer Financial Protection Bureau found 96% of fees paid by consumers using employer-integrated EWA providers were for expedite fees. Consumer Financial Protection Bureau, Data Spotlight: Developments in the Paycheck Advance Market (July 18, 2024),

12

45. Turning to the second type of fee, "**tips**" are simply additional funds the lender prompts the user to pay.

46. These purported "tips" serve no purpose whatsoever to MoneyLion customers and instead go directly to MoneyLion's bottom line.

47. EWA providers like MoneyLion deploy techniques borrowed from behavioral economics to pressure users into tipping each time they obtain an EWA loan. For example, the California Department of Financial Protection and Innovation ("DFPI") listed "multiple strategies that lenders use to make tips almost as certain as required fees," including "[s]etting default tips and using other user interface elements to mak[e] tipping hard to avoid; [m]aking it difficult to set a $0 tip or not advertising that a particular payment is optional; and [c]laiming that tips are used to help other vulnerable consumers or for charitable contributions."[27]

48. MoneyLion weaponizes each of these strategies against its customers to secure tips, and to great effect. A recent data summary found that EWA providers that request tips receive them in 73% of transactions, on average $4.09 in tips per transaction.[28] Example tip screens MoneyLion shows its customers are included below:

---

https://www.consumerfinance.gov/data-research/research-reports/data-spotlight-developments-in-the-paycheck-advance-market/.

[27] *2021 Earned Wage Access Findings*, CAL. DEP'T FIN. PROTEC. & INNOVATION, at 61–62 (March 2023), https://dfpi.ca.gov/wp-content/uploads/sites/337/2023/03/PRO-01-21-ISOR.pdf (hereinafter "DFPI Findings")

[28] *Id.* at 62.

13

Case 1:25-cv-04098    Document 1-1    Filed 05/15/25    Page 56 of 77



49.    One of MoneyLion's competitors—who offers a substantially similar EWA product and deploys the same strategies used by MoneyLion in soliciting tips—said in public testimony that 40% of its revenue comes from tips alone.[29] Another of MoneyLion's competitors—who likewise offered a materially similar EWA product for which it solicited tips—reported receiving more than $56,000,000 in tips in 2023 alone, approximately 22% of the company's revenue for that year.[30] Upon information and belief, MoneyLion receives millions of dollars annually in so-called "tips."

50.    When properly viewing EWA products' tips and expedite fees as costs of credit (*i.e.* finance charges), the annual percentage rates (APR) for these loans are eye-popping.

---

[29] Vt. House Comm. on Com. and Econ. (2023, February 14), at 2:16:45, available at https://www.youtube.com/clip/Ugkx7fEU-NXc2ZqgurJSRZTHXm_rpCNHzVcU.
[30] *Dave Inc. Form 10-K*, available at https://investors.dave.com/static-files/26e2fc51-3b9e-432b-9b70-37b7e44cadac (last visited Mar. 13, 2025).

14

51.     A recent study found the average APR imposed by EWA providers (that collect tips and expedite fees) is 334%, in line with payday loans:

**Total cost of using earned wage access products is close to that of payday loans**

The average APR for earned wage access advances is over 330%, according to 2021 data on transactions across five companies. Of the 5.8 million transactions completed by tip-based companies, 73% included tips.

*Annual Percentage Rates (APRs) help compare the total cost of borrowing money, including interest and fees:*

New car loans
7%

Credit card plans
21%

Wage-based cash advances that don't request tips
331%

Wage-based cash advances that request tips
334%

Payday loans
353%

Chart: Erica Yee, CalMatters · Source: national average APRs for new car loans and credit card accounts with finance charges (2023 Q1) from the Federal Reserve; state average APRs for earned wage access products and payday loans (2021) from the CA Dept. of Financial Protection & Innovation · Get the data · Created with Datawrapper

52.     The APR received by MoneyLion for its Instacash product is similar, though sometimes *much higher*. As discussed *infra*, some of MoneyLion's loans to Plaintiff were even more expensive, with APRs as high as **1,093%**. *See infra*.

53.     Ironically, MoneyLion and other EWA providers market their products as low-cost alternatives to payday loans.[31] In truth, MoneyLion is a wolf in sheep's clothing: extending loans with APRs nearly identical to the exorbitantly-priced payday loans it claims to replace.

54.     On top of charging loan-shark interest rates, MoneyLion and others limit the amount a borrower can access per advance, while simultaneously allowing multiple advances per day and per pay period, thereby fostering repeat withdrawals and concomitant repeated payment of expedite fees and tips.

---

[31] *What Do You Need for a Payday Loan*, MONEYLION.COM: BORROW (Feb. 21, 2025), https://www.moneylion.com/learn/what-do-you-need-for-a-payday-loan/ (characterizing EWA products as a "safer alternative" to a payday loan); *see id.* ("Access funds directly from your paycheck without the high fees of payday loans.").

15

55.     MoneyLion limits the amount its customers can borrow on a daily and per pay period basis. The limitations (MoneyLion's "Instacash limit") vary depending on the borrower's "anticipated income amount" and whether the borrower has their loan proceeds delivered to an external account or deposited in a "RoarMoney account."[32] Many borrowers, including Plaintiff, are permitted to borrow up to $500 per day but only in $100 increments, meaning a borrower paying a Turbo fee on all five loans would pay a whopping $44.95 *in Turbo fees alone* for access to a short-term $500 cash advance.

56.     This architecture maximizes fees for EWA providers like MoneyLion, while creating a debt trap for vulnerable consumers. "By imposing limitations on how much can be borrowed in a single advance, while allowing more than one advance per pay period, lenders force borrowers to take out multiple advances—and pay multiple fees—to access more money. The business model capitalizes on most borrowers' financial precarity, and the user interface of these products makes paying a fee or leaving a tip difficult to avoid."[33]

57.     The end result is a product that traps consumers in cycles of debt, worsens their financial circumstances, leads to more overdraft fees, and an ever-increasing reliance on emergency funds from—and the fees that come with—EWA loans.

58.     A CRL analysis found consumers who used EWA products took out advances repeatedly, with many taking advances on the same day or the day after repayment and were consequently more likely to overdraft their accounts and be forced to pay overdraft fees. Specifically, the CRL found that 27% of EWA users take out at least 25 loan advances a year,

---

[32]     *MoneyLion          Instacash*,          https://www.moneylion.com/cash-advance/instacash?traffic_src=web&medium=secondnav&campaign_id=cash-advance/instacash (last visited Mar. 13, 2025).
[33] Candice Wang, Lucia Constantine, Monica Burks, Yasmin Farahi, *A Loan Shark In Your Pocket: The Perils of Earned Wage Advance*, CTR. FOR RESPONSIBLE LENDING, at 7 (Oct. 2024) (hereinafter "*Loan Shark*").

16

and for 33% of users, the vast majority (80%) of their borrowing is followed by reborrowing within two weeks.[34] This suggests receiving a reduced paycheck (*i.e.*, reduced to pay back EWA loans and fees) necessitated taking out more advances in the following pay period.

59.     Another CRL study found that using EWA products is closely correlated with overdraft fees. "Overdrafts on consumers' checking accounts increased 56% on average after use of an advance product."[35]

### ii.     EWA Providers Utilize Strict Underwriting Procedures and, Consequently, Almost Always Collect

60.     While EWA products are financially disastrous for customers, they have proven profitable for the companies selling them. These companies maximize profits by using exacting underwriting procedures that ensure cash advances, and the fees that accompany them, are timely repaid through automated bank account debits that borrowers authorize when taking out the loans.

61.     MoneyLion has various criteria borrowers must meet to be eligible for an Instacash advance. For instance, prospective borrowers must link a bank account to the MoneyLion app and that account must (1) have been active for at least sixty days, (2) receive regularly scheduled income deposits—which in turn must be payroll-related, government benefits, or pension payments—and (3) be registered to the MoneyLion accountholder.

62.     A borrower must demonstrate consistent payment history, generally at least three recurring direct deposits from the same source to the linked bank account.

63.     MoneyLion routinely rejects applicants whom it deems insufficiently creditworthy. Reasons for rejection include failure to link an account, irregular paychecks, not enough transaction history, or missed payments on other loan products offered by MoneyLion.

---

[34] *Loan Shark, supra* note 33, at 7.
[35] *Not Free, supra* note 25, at 6.

17

64.     MoneyLion takes steps to verify its borrowers' consistent income by obtaining and reviewing troves of financial data in qualifying consumers for Instacash advances.

65.     To determine whether a borrower is creditworthy and decide how much credit to extend in the first place, MoneyLion requires users to connect their accounts to MoneyLion through Plaid. Plaid is a financial services provider that partners with MoneyLion and other fintech companies to allow them to view customer banking information. Plaid allows MoneyLion to "[q]uickly verify assets and income" of borrowers, providing "real-time insights into a borrower's income and employment in seconds with a breakdown of earnings from salaries, gig work, and more."[36]

66.     In addition to using Plaid to peruse borrower bank accounts, MoneyLion requires borrowers provide it direct access to their payroll records using "Pinwheel." Pinwheel is another financial services company that provides "real-time income and employment verifications" to enable "underwriting with verified data – directly from the source of truth."[37] In short, through the payroll records obtained through Pixel, MoneyLion obtains a "full income picture" of its borrowers in "real-time."[38] MoneyLion thus knows precisely when and how much its borrowers will be paid before they are paid, and is given advance notice of income changes (*i.e.*, in the event a borrower gets a raise or pay cut, quits or is fired) that affect the likelihood of MoneyLion's loans being repaid.

67.     MoneyLion uses its real-time insight into customer financials to ensure borrowers will have sufficient funds to repay their loans on payday (*i.e.*, in the underwriting

---

[36] *Plaid Solutions: Credit*, Plaid.com, https://plaid.com/solutions/credit/ (last visited Mar. 13, 2025).
[37] Pinwheel, *Real Time Income and Employment Verifications*, https://www.pinwheelapi.com/products/verify-income-employment (last visited Mar. 13, 2025).
[38] *Id.*

18

process) and to schedule its repayment debits as soon as payday hits, ensuring their loans are paid as soon as funds become available.

68.    MoneyLion's underwriting process is both detailed and continual. MoneyLion continually adjusts maximum withdrawal amounts—both daily and per pay period—depending on the individual's borrowing history and financial health (as gleaned through Plaid and Pinwheel).

69.    For borrowers who qualify, MoneyLion monitors their financial health to determine how much credit to extend based on borrowers' need and ability to repay. In determining how much credit to extend, MoneyLion considers a variety of factors including the consistency of deposits, the borrowers' history of paying back Instacash loans, bank account balances, account activity, and other factors.[39]

70.    Through its constant underwriting process, MoneyLion extends loans to borrowers only when it is confident they will repay.

71.    For qualifying borrowers, MoneyLion generally begins by offering relatively low amounts of credit, with new borrowers unlocking "a minimum of $10 after linking your external deposit account." Borrowers obtain greater access to credit—*i.e.*, MoneyLion raises their maximum loan limit—by consistently paying off loans to MoneyLion on time and generally improving their financial health (which MoneyLion monitors by directly viewing borrowers' financial and payroll accounts through Plaid and Pinwheel).[40]

---

[39] *Why Amounts and Limits May Change*, MONEYLION.COM, https://www.moneylion.com/resources/why-amounts-and-limits-may-change/#:~:text=Instacash%20is%20an%20optional%20service,factors%20as%20determinde%20by%20MoneyLion (last visited Mar. 17, 2025).

[40] *See, e.g., id.* (explaining borrowers may increase their loan limits by demonstrating consistent income and may "boosts" their credit limit by "making two or more consecutive on-time payments"), https://www.moneylion.com/resources/why-amounts-and-limits-may-change/#:~:text=Instacash%20is%20an%20optional%20service,factors%20as%20determinde%20by%20MoneyLion.

19

72.     Additionally, changes to financial factors, such as "a shift in the regularity of detectable recurring deposits, a salary increase, a salary decrease," more or fewer deposits, or "other factors" may result in changes to a borrower's Instacash limit. At bottom, "the more money you have coming into your account that [MoneyLion] can verify, the greater likelihood you'll qualify for more Instacash."[41]

73.     These underwriting methodologies—extending credit only to those who will repay, and only in amounts that are likely to be repaid—are precisely the same methods used by traditional credit issuers, like banks. "US credit card lenders individualize interest rates and credit limits according to assessments of customers' default risk."[42] The only distinction—that traditional lenders review credit scores and borrowers' applications to determine creditworthiness while EWA providers like MoneyLion directly review borrowers' financial accounts—is one without a difference.

74.     In addition to these loan qualification procedures, borrowers must link a bank account or debit card to their MoneyLion profile to ensure seamless repayment.

75.     Users must "agree to our Automatic Debit Authorization agreement" which "authorizes MoneyLion to debit the chosen payment method on the scheduled repayment

---

[41] *Why Amounts and Limits May Change*, Moneylion.com, https://www.moneylion.com/resources/why-amounts-and-limits-may-change/#:~:text=Instacash%20is%20an%20optional%20service,factors%20as%20determinde%20by%20MoneyLion (last visited Mar. 17, 2025).

[42] Matcham, *Risk-Based Borrowing Limits in Credit Card Markets* (Mar. 10, 2015), https://willmatcham.com/img/main_rbbl_matcham_2024_08_15.pdf; *see also* Dey, Mumy, *Determinants of Borrowing Limits on Credit Cards*, Fed. Reserve Bank of Boston (2006), ("Publicly available information about borrowers' creditworthiness helps banks sort their client pool into broad risk classes by way of their credit scoring systems. . . . Profit-maximizing banks choose to provide exactly the amount of credit to their borrowers that maximize their expected profits."), https://www.bostonfed.org/-/media/Documents/events/payment-choice/papers/Dey.pdf; *What are credit limits?*, Armed Forces Bank (Apr. 4, 2024) ("Financial institutions grant credit limits that allow you to use credit . . . while ensuring you can manage your payments."), https://www.afbank.com/article/what-are-credit-limits-and-how-are-they-determined.

20

date."[43] Repayments are "typically aligned with the next payday, where the advanced amount is automatically deducted from the paycheck deposited into the employee's bank account."[44]

76.     Failure to pay back an Instacash loan results in suspension of the borrower's MoneyLion account.

77.     In sum, MoneyLion's underwriting process requires, before any money changes hands, that borrowers: (1) demonstrate they are employed and regularly paid through that employment; (2) link the bank account to which paychecks are deposited to MoneyLion's app through Plaid; (3) connect at least one method of repayment (more are "highly encouraged"); (4) connect the MoneyLion application to their payroll records through Pinwheel; (5) authorize MoneyLion to automatically debit the linked accounts on the borrower's payday in an amount that is equal to the cash advance the borrower receives (the principal loan amount) plus fees and tips; and (6) be current on all prior MoneyLion Instacash loans. Borrowers who fail to complete these steps cannot obtain cash advances.

78.     Additionally, if a customer is unable to repay a loan, MoneyLion prevents them from using the product—which cash-strapped customers are usually *dependent on*—until the loan is repaid.

79.     Through these underwriting procedures and policies, MoneyLion ensures it will be able to automatically deduct the sum of the cash-advance loan amount (the loan principal), plus any additional charges, from the linked account as soon as the borrower's employer deposits the borrower's next paycheck.

---

[43] *Repaying Instacash*, help.moneylion.com, https://help.moneylion.com/en us/repaying-instacash-BkH86xQkC (last visited Mar. 13, 2025).
[44] *What is Earned Wage Access? The Complete Guide*, MoneyLion.com, https://www.moneylion.com/learn/earned-wage-access/ (last visited Mar. 13, 2025).

21

80. These debt collection methods are so successful that lenders recoup their advances at least 97% of the time using these tactics.[45]

**b. MoneyLion's Loans to Plaintiff**

81. Specialist Lowe is currently an active duty servicemember in the National Guard stationed at Fort Benning in Georgia.

82. He has been an active duty servicemember since 2008 and will remain on active duty until at least 2026.

83. MoneyLion extended consumer credit to Plaintiff in the form of Instacash loan transactions like those discussed above.

84. Plaintiff used the loans from MoneyLion for personal, family, or household purposes.

85. Plaintiff paid MoneyLion's finance charges, in the form of Turbo speed fees and tips, to obtain cash-advance loans from MoneyLion,

86. A small selection of Instacash loans made by MoneyLion to Plaintiff are shown in the below table, with the estimated cost of credit and MAPR included:

*Table 1*

| Date | Principal Amt. | Turbo Fees and/or Tips | Loan Period | APR |
|---|---|---|---|---|
| 2/10/25–2/13/25 | $100.00 | $8.99 | 3 days | 1,093% |
| 2/4/25–2/13/25 | $50.00 | $5.99 | 9 days | 486% |
| 11/27/24–12/6/24 | $100.00 | $8.99 | 9 days | 365% |
| 5/19/24–5/29/24 | $25.00 | $3.99 | 10 days | 583% |

---

[45] Devina Khanna and Arjun Kaushal, *Earned Wage Access and Direct-to-Consumer Advance Usage Trends*, Fin. Health Network (April 2021) at 2, available at https://cfsi-innovation-files-2018.s3.amazonaws.com/wp-content/uploads/2021/04/26190749/EWA_D2C_Advance-_sage_Trends_FINAL.pdf.

22

| 11/17/23–11/24/23 | $100.00 | $8.99 | 7 days | 469% |
|---|---|---|---|---|

87.    Specialist Lowe has received dozens of usurious loans from MoneyLion since he started using the service in 2023.

88.    The Turbo speed fees and tips are immediately and directly connected to MoneyLion's extensions of credit to Plaintiff.

89.    Further, MoneyLion's credit agreement required Specialist Lowe to purportedly waive his right to a jury trial and waive his right to participate in a class action in violation of 10 U.S.C. § 987(e)(2).

90.    MoneyLion's credit agreement also failed to include mandatory MLA loan disclosures in violation of 10 U.S.C. § 987(c) and TILA.

**c.   MoneyLion Violates the MLA and the TILA**

91.    The MLA prohibits a creditor from obligating a "Covered Member" to a loan that exceeds 36% MAPR. "The MAPR is the cost of the consumer credit expressed as an annual rate." 32 C.F.R. § 232.3. The MAPR includes "finance charges associated with the consumer credit." 32 C.F.R. § 232.4.

92.    A "Covered Member" under the statute is a "member of the armed forces who is on active duty under a call or order that does not specify a period of 30 days or less."

93.    Specialist Lowe and the MLA Class Members are subject to the protections and limitations imposed by the MLA. The MLA protects any consumer who, at the time the consumer becomes obligated on a consumer credit transaction or establishes an account for consumer credit, is a member of the armed forces or a dependent of a Covered Member (as defined in 32 CFR 232.3(g)(2) and (g)(3)).

23

94.     Specialist Lowe is a Covered Borrower with respect to his loan agreements with MoneyLion because he took out the loan while an active-duty service member for personal, family or household purposes.

95.     MoneyLion is a "creditor" subject to the requirements and limitations imposed by the MLA because it engages in the business of extending consumer credit to Covered Borrowers. 10 U.S.C. § 987(i)(5); also 32 C.F.R. § 232.3(i).

96.     The underlying loan transactions at issue in this case constitute "consumer credit" subject to the protections and limitations imposed by the MLA because they are "credit offered or extended to a Covered Borrower primarily for personal, family, or household purposes," subject to a finance charge and not subject to any statutory exception. 32 C.F.R. § 232.3(f)(1)(i); 10 U.S.C. § 987(i)(6).

97.     MoneyLion violates the MLA in at least four distinct ways: By (1) charging interest above the 36% statutory MAPR rate cap; (2) failing to provide any required MLA Disclosures; (3) including a class action and jury trial waiver which is prohibited by the MLA; and (4) including a mandatory binding arbitration clause. See, 10 U.S.C. § 987(b), (c), (e)(2), (e)(6)–(7).

98.     As a result of MoneyLion's failure to provide substantially any of the disclosures required by TILA, MoneyLion also violates 15 U.S.C. § 1638.

## VI.     TOLLING

99.     The Servicemember Civil Relief Act ("SCRA"), 50 U.S.C. §§ 3901 et seq., tolls any and all limitations or repose periods for all active-duty military members, including those similarly situated to Specialist Lowe, until their active-duty service concludes. Specifically, § 3936(a) of the SCRA provides:

> The period of a servicemember's military service may not be included in computing any period limited by law, regulation, or order for the bringing of

24

any action or proceeding in a court, or in any board, bureau, commission, department, or other agency of a State (or political subdivision of a State) or the United States by or against the servicemember or the servicemember's heirs, executors, administrators, or assigns.

## VII.    CLASS ALLEGATIONS

100.    Specialist Lowe seeks to represent two classes of individuals pursuant to NY CPLR § 901 (2015), *et seq.*

101.    Specialist Lowe seeks to represent the "MLA Class" and the "TILA Class" (collectively the "Classes"). Specialist Lowe brings this action individually and on behalf of classes of which he is a member and initially defined:

> **MLA Class**: All Covered Members and dependents of Covered Members who entered into an agreement with MoneyLion to use its "Instacash" product, in which MoneyLion was paid a finance charge (including, without limitation, a turbo speed fee or tip).

> **TILA Class**: All individuals in the United States that entered into an agreement with MoneyLion to use its "Instacash" product, in which MoneyLion was paid a finance charge (including, without limitation, a turbo speed fee or tip).

102.    Expressly excluded from the Classes are: (a) any Judge presiding over this action and members of their families; (b) MoneyLion and any entity in which MoneyLion has a controlling interest, or which has a controlling interest in MoneyLion, and its legal representatives, assigns and successors; and (c) all persons who properly execute and file a timely request for exclusion from the Classes.

103.    Specialist Lowe reserves the right to amend the Class definitions if further investigation and discovery indicates that the Class definitions should be narrowed, expanded, or otherwise modified.

104.    **Numerosity**. MoneyLion's scheme has harmed and continues to harm the members of the Classes. The members of the proposed Classes are so numerous that joinder of all members is impracticable.

25

Case 1:25-cv-04098 Document 1-1 Filed 05/15/25 Page 68 of 73

105. The exact number of Class members is unknown, but MoneyLion has made millions of loans, and Specialist Lowe estimates there are, at least many thousands of consumers in the MLA Class and TILA Class as MoneyLion has issued thousands of loans to members of the Classes in a manner that violates the MLA and TILA.

106. **Commonality**. Common questions of law and fact affect the right of each Class member and common relief by way of damages is sought for Specialist Lowe and Class members.

107. The harm that MoneyLion has caused or could cause is substantially uniform with respect to Class members. Common questions of law and fact that affect the Class members include, but are not limited to:

a. Whether Specialist Lowe and the MLA Class members are Covered Borrowers subject to the protections and limitations of the MLA;

b. Whether MoneyLion is a "creditor" subject to the protections and limitations of the MLA;

c. Whether MoneyLion's loans constitute an extension of "consumer credit" subject to the protections and limitations of the MLA and TILA;

d. Whether MoneyLion entered into standard form loan agreements with Covered Borrowers;

e. Whether MoneyLion's loans exceed the MLA statutory rate cap of 36% MAPR;

f. Whether MoneyLion failed to provide required MLA disclosure in violation of the MLA;

g. Whether MoneyLion's standard form loan agreements contain a class action waiver provision or jury trial waiver provision in violation of the MLA;

26

h. Whether MoneyLion's standard form loan agreements contain an arbitration clause in violation of the MLA;

i. Whether MoneyLion failed to provide required credit disclosures in violation of the MLA and TILA;

j. Whether each month MoneyLion charged interest to Specialist Lowe and Class Members it restarted the statute of limitations under the MLA;

k. Whether each month that Specialist Lowe and the Class Members paid money to MoneyLion it restarted the statute of limitations under the MLA;

l. Whether Class members are entitled to actual or statutory damages for the aforementioned violations and, if so, in what amounts;

m. Whether MoneyLion should be enjoined from continuing its lending practices in the manner challenged herein;

n. Whether MoneyLion is subject to punitive damages, and, if so, the proper measure of such damages and remedies to which Specialist Lowe and the Class are entitled under 10 U.S.C. § 987(f)(5); and

o. Any declaratory and/or injunctive relief to which the Classes are entitled.

108. **Typicality**. The claims and defenses of Specialist Lowe are typical of the claims and defenses of the MLA Class because Specialist Lowe is a Covered Borrower and his loan agreements with MoneyLion are typical of the type of personal, household, or family loans that MoneyLion normally provides to Covered Borrowers. Additionally, MoneyLion uses the same or substantially similar standard form loan agreement in all of its lending transactions. The documents involved in the transaction were standard form documents and the violations are statutory in nature. Specialist Lowe suffered damages of the same type and in the same

27

manner as the Classes he seeks to represent. There is nothing peculiar about the Plaintiff's claims.

109. **Adequacy**. Specialist Lowe will fairly and adequately assert and protect the interests of the Classes. Specialist Lowe has hired attorneys who are experienced in prosecuting class action claims and will adequately represent the interests of the Classes, and Specialist Lowe has no conflict of interest that will interfere with maintenance of this class action.

110. **Predominance**. The previously articulated common issues of fact and law predominate over any question solely affecting individual Class Members. Resolution of the common issues in this litigation will resolve virtually the entirety of every Class Members' claims in a single stroke. There are no significant individual questions of liability or damages whatsoever, and certainly not ones that predominate over issues common to the Classes. Thus, predominance within the meaning of Rule 23(b)(3) is established.

111. **Superiority**. A class action provides a fair and efficient method for the adjudication of this controversy. There are no unusual legal or factual issues that would create manageability problems; Prosecution of thousands of separate actions by individual members of the Classes would create a risk of inconsistent and varying adjudications against MoneyLion and could create incompatible standards of conduct; Adjudications with respect to individual members of the Classes could, as a practical matter, be dispositive of any interest of other members not parties to such adjudications, or substantially impair their ability to protect their interests; and the claims of the individual Class members are small in relation to the expenses of litigation, making a class action the only procedural method of redress in which Class members can, as a practical matter, vindicate their legal claims and enforce their statutory rights.

28

112.    MoneyLion has acted and refused to act on grounds generally applicable to the Classes, thereby making declaratory relief and corresponding final injunctive relief under the California Rules of Civil Procedure appropriate with respect to the Classes. MoneyLion should be enjoined from making loans to Covered Borrowers in violation of the MLA and TILA and a declaration should be made that the loans are void from inception.

## VIII.    CLAIMS FOR RELIEF

### COUNT I
### VIOLATIONS OF MILITARY LENDING ACT

113.    Specialist Lowe brings this claim on behalf of himself and the MLA Class and incorporates paragraphs 1–112 by reference.

114.    The MLA prohibits a creditor from obligating a "Covered Member" or dependent of a Covered Member (collectively, "Covered Borrowers") to a loan in excess of 36% MAPR.

115.    A "Covered Member" in the statute is a "member of the armed forces who is on active duty under a call or order that does not specify a period of 30 days or less."

116.    "The MAPR is the cost of the consumer credit expressed as an annual rate." 32 C.F.R. § 232.3. The MAPR includes as relevant here, "finance charges associated with the consumer credit." 32 C.F.R. § 232.4.

117.    Specialist Lowe and the MLA Class Members are "Covered Borrowers," subject to the protections and limitations imposed by the MLA. A Covered Borrower is a consumer who, at the time the consumer becomes obligated on a consumer credit transaction or establishes an account for consumer credit, is a Covered Member of the armed forces or a dependent of a Covered Member (as defined in 32 CFR 232.3(g)(2) and (g)(3)).

29

118.    Specialist Lowe is considered a "Covered Borrower" with respect to his MoneyLion loan agreements because Specialist Lowe is an active duty service member who is obligated by law to repay loans he took out for personal, family or household purposes.

119.    MoneyLion is a "creditor" subject to the requirements and limitations imposed by the MLA in that it engages in the business of extending consumer credit to Covered Borrowers protected by the MLA. 10 U.S.C. § 987(i)(5); also 32 C.F.R. § 232.3(i).

120.    The underlying loan transactions at issue in this case constitute "consumer credit" subject to the protections and limitations imposed by the MLA because they are "credit offered or extended to a Covered Borrower primarily for personal, family, or household purposes," subject to a finance charge and outside the ambit of any of the identified exceptions. 32 C.F.R. § 232.3(f)(1)(i); also 10 U.S.C. § 987(i)(6).

121.    MoneyLion charged Specialist Lowe and the MLA class well above the 36% interest rate cap on their loans, in violation of the MLA.

122.    MoneyLion fails to make all the disclosures required by 10 U.S.C. § 987(c)(1)(A) and 32 C.F.R. § 232.6 in its standard form loan agreements, in violation of the MLA.

123.    MoneyLion's standard form loan agreements include mandatory arbitration agreements in violation of 10 U.S.C. § 987(e)(3).

124.    MoneyLion's standard form loan agreements include class action waivers trial waivers in violation of 10 U.S.C. § 987(e)(2).

125.    As a result, MoneyLion violates 10 U.S.C. § 987.

## COUNT II
## VIOLATIONS OF THE TRUTH IN LENDING ACT

126.    Specialist Lowe brings this claim on behalf of himself and the TILA Class and incorporates paragraphs 1–112 by reference.

30

Case 1:25-cv-04098    Document 1-1    Filed 05/15/25    Page 73 of 77

127.    TILA and Regulation Z require creditors to provide consumers with specified disclosures for closed-end credit transactions. 15 U.S.C. § 1638; 12 C.F.R. §§ 1026.17, 1026.18. MoneyLion's loan agreements are closed-end credit transactions because they are not open-end credit transactions. Open-end credit transactions are "a plan under which the creditor reasonably contemplates repeated transactions, which prescribes the terms of such transactions, and which provides for a finance charge which may be computed from time to time on the outstanding unpaid balance." 15 U.S.C. § 1602.

128.    Among other requirements, the Regulation prescribes the format of the disclosures, as well as disclosure of certain terms themselves, such as the annual percentage rate and finance charge. 12 C.F.R. §§ 1026.17, 1026.18.

129.    MoneyLion is a creditor whose financing qualifies as "credit" under TILA and Regulation Z, and its loan agreements with consumers are therefore subject to TILA and Regulation Z's disclosure requirements. See 12 C.F.R. § 1026.2(a)(14).

130.    MoneyLion has not provided such disclosures before consummation of the loan agreements.

131.    MoneyLion failed to provide such disclosures to Specialist Lowe and the TILA Class.

132.    As a result, MoneyLion violated TILA and Regulation Z. 15 U.S.C. § 1638; 12 C.F.R. §§ 1026.17 & 1026.18.

### PRAYER FOR RELIEF

WHEREFORE, Specialist Lowe prays that the Court enter an Order:

A. Certifying this action as a class action as provided by Fed. R. Civ. P. 23, appointing Specialist Lowe as Class Representative, and appointing undersigned attorneys and their firms as Class Counsel;

31

B. Declaring that MoneyLion violated the MLA and adjudging that Specialist Lowe and MLA Class Members' standard form loan agreements violate the MLA;

C. Adjudging that MoneyLion violated the MLA and awarding Specialist Lowe and MLA Class Members actual damages of not less than $500 per violation pursuant to 10 U.S.C. § 987(f)(5)(A)(i);

D. Adjudging that MoneyLion violated TILA and awarding Specialist Lowe and the TILA Class actual damages and statutory damages pursuant to 15 U.S.C. § 1640;

E. Adjudging that MoneyLion violated the MLA and award Specialist Lowe and MLA Class Members punitive damages pursuant to 10 U.S.C. § 987(f)(5)(A)(ii);

F. Awarding Specialist Lowe and the Classes, reasonable attorneys' fees and costs incurred in this action;

G. Enjoining MoneyLion from continuing to engage in predatory lending practices in violation of the MLA and TILA;

H. Awarding Specialist Lowe, and the MLA Class, any pre-judgment and post judgment interest as may be allowed under the law; and

I. Awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Specialist Lowe demands a jury trial on all issues so triable.

Dated: March 17, 2025                          Respectfully submitted,

                                               By: /s/

32

THE LAW OFFICE OF THOMAS M. MULLANEY
Thomas M. Mullaney
530 Fifth Avenue
23rd Floor
New York, NY 10036
Telephone: (212) 223-0800
Email: tmm@mullaw.org

CARNEY BATES & PULLIAM, PLLC
Randall K. Pulliam (*pro hac vice* forthcoming)
Edwin Lee Lowther III (*pro hac vice* forthcoming)
Courtney Ross Brown (*pro hac vice* forthcoming)
One Allied Drive, Suite 1400
Little Rock, AR, 72202
Telephone: (501) 312-8500
Email: rpulliam@cbplaw.com
Email: llowther@cbplaw.com
Email: cbrown@cbplaw.com


JACOBSON PHILLIPS PLLC
Jacob L. Phillips (pro hac vice forthcoming)
Joshua R. Jacobson (pro hac vice forthcoming)
478 E. Altamonte Dr.
Ste 108-570
Altamonte Springs, FL 32701
Telephone: (407) 720-4057
Email: jacob@jacobsonphillips.com
Email: joshua@jacobsonphillips.com

33

FILED: NEW YORK COUNTY CLERK 05/02/2025 11:54 AM
NYSCEF DOC. NO. 3
Case 1:25-cv-04098    Document 1-1    Filed 05/15/25    Page 76 of 77

INDEX NO. 153635/2025
RECEIVED NYSCEF: 05/02/2025

## SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF NEW YORK

**JAMES LOWE, individually, and on behalf of all others similarly situated,**

**Plaintiff,**

**v.**

**MONEYLION TECHNOLOGIES, INC., d/b/a MONEYLION,**

**Defendant.**

**INDEX NO.: 153635/2025**

**CLASS ACTION**

## NOTICE OF APPEARANCE

Please take notice that Samuel R. Jackson, of the law firm Carney Bates & Pulliam, PLLC, One Allied Drive, Suite 1400, Little Rock, Arkansas 72202, hereby enters his appearance as counsel of record for Plaintiff James Lowe in the above captioned proceeding. Mr. Jackson is a member in good standing of the bar of the State of New York and is admitted to practice before the state court in New York.

Dated: May 2, 2025
Little Rock, Arkansas

*/s/ Samuel R. Jackson*
Samuel R. Jackson (5332325)
CARNEY BATES & PULLIAM, PLLC
One Allied Drive, Suite 1400
Little Rock, Arkansas 72202
Telephone: (501) 312-8500
Email: sjackson@cbplaw.com

*Attorneys for Plaintiff*

1

Case 1:25-cv-04098   Document 1-1   Filed 05/15/25   Page 77 of 77

## CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of May 2025, I electronically filed the foregoing Notice of Appearance with the Clerk of the Court, which will send electronic notification to the parties and registered attorneys of record.

_/s/ Samuel R. Jackson_
Samuel R. Jackson

2