## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **JAMES LOWE, MICHAEL COLLINS, and RAE FULLER, individually, and on behalf of all others similarly situated,** | |
| **Plaintiff,** | CASE NO.: 1:25-cv-04098-DEH-SLC |
| **v.** | **CLASS ACTION** |
| **MONEYLION TECHNOLOGIES, INC., d/b/a MONEYLION,** | **DEMAND FOR JURY TRIAL** |
| **Defendant.** | |

## AMENDED CLASS ACTION COMPLAINT

Plaintiffs James Lowe, a Machine Mechanic in the Army National Guard ("Specialist Lowe"), Michael Collins, a Petty Officer in the United States Navy ("PO Collins"), and Rae Fuller, a Sergeant in the United States Army ("Sgt. Fuller"), on behalf of themselves and all others similarly situated, allege the following based upon personal knowledge as to themselves and upon information and belief and the investigation of their counsel as to all other matters, and bring this Amended Class Action Complaint against MoneyLion Technologies, Inc. (D/B/A MoneyLion) ("MoneyLion" or "Defendant") and allege as follows:

### I.    NATURE OF THE ACTION

1.    This Complaint seeks to protect active-duty military service members, Illinois residents, and Georgia residents from MoneyLion's predatory lending practices that violate the Military Lending Act, 10 U.S.C. § 987, *et seq.* ("MLA"), the Truth in Lending Act, 15 U.S.C. § 1638 ("TILA"), the Georgia Payday Lending Act ("PLA"), O.C.G.A. § 16-17-2, *et seq.*, and the Illinois Predatory Loan Prevention Act, 815 ILCS 123/15-5-5, *et seq.* ("PLPA").

1

2.      MoneyLion is in the business of payday lending through an earned wage access ("EWA") product called "Instacash"—it makes funds available to its customers, who repay principal and finance charges (including expedite fees and so-called "tips") on payday. Its business model entails making high-frequency, short-term, and high-cost loans to consumers living paycheck to paycheck. [1] MoneyLion specifically targets financially struggling households, with internal documents noting that its "target market is the 70% of hard working and gig economy Americans who do not want fees at their financial institutions and have little in savings."

3.      Despite advertising its loans as having "no interest," in practice, MoneyLion takes in ***triple*** and sometimes ***quadruple*** digit finance charges from borrowers. MoneyLion issued Plaintiffs many expensive loans, with several loans having finance charges exceeding **1,000%** military annual percentage rate ("MAPR").

4.      A recent analysis of MoneyLion's short-term Instacash loans found that the three most popular (and most issued) loans carry APRs spanning between 234% and 450%. The end result is a financial product that extracts exorbitant fees from workers, encourages serial usage and dependance on the costly loans, worsens workers' financial circumstances, and traps them in a cycle of debt.

5.      Specialist Lowe, PO Collins, and Sgt. Fuller have each used MoneyLion's Instacash product for years. By virtue of, *inter alia*, the sky-high fees charged for these cash advance loans, MoneyLion has extended consumer credit to Plaintiffs on numerous occasions in violation of the MLA, TILA, PLA, and PLPA.

---

[1] MoneyLion advertises aggressively to its target audience—according to its most recent 10-K filing, MoneyLion spent approximately $49 million in advertising in 2024 alone.

6.      Borrowing money that is repaid on payday is not an innovation; it is a loan. As EWA products have become more popular, the parallels to payday lending are striking. Like payday loans, EWA products trap users in a cycle of reborrowing that increases their financial distress, all in service of generating revenue for predatory lenders. Considering the substance of the transactions, MoneyLion's Instacash transactions are in reality extensions of consumer credit.

7.      The MLA was enacted to protect United States active-duty service members and their dependents (collectively, "Covered Borrowers") from predatory lending. Excessive debt endangers our nation's military readiness and is detrimental to service-member retention, morale, household stability, security clearances, and career advancement. Notably here, MoneyLion makes no effort to fulfill its duty to determine whether it is lending to Covered Borrowers or to provide legally mandated protections for them.

8.      In violation of the MLA, Defendant uses its Instacash product to saddle Covered Members with charges that yield a MAPR well in excess of the MLA's legal limit.

9.      MoneyLion's consumer credit agreements violate the MLA in at least five ways: By (1) charging interest above the 36% statutory MAPR cap; (2) failing to provide any required MLA Disclosures; (3) including a class action and jury trial waiver; (4) including a mandatory binding arbitration clause; and (5) using a method of access to a deposit, savings, or other financial account maintained by the borrower as security for the obligation. 10 U.S.C. § 987(b), (c) & (e)(1)(2)(5)(6).

10.     Among the abusive lending practices the MLA is designed to curb is predatory payday loans made to servicemembers.[2] In a Department of Defense report on predatory

---

[2] *Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents*, U.S. DEP'T OF DEFENSE (Aug. 9, 2006), available at https://apps.dtic.mil/sti/pdfs/ADA521462.pdf.

3

lending practices affecting military members (the "Report"), the egregious lending practices prevalent in the payday lending industry are highlighted.[3] The Report notes that payday lenders are "heavily concentrated around military bases," with statistics showing that communities with military installations "rank among the most heavily targeted communities in their respective states."[4] Military populations are targeted for an obvious reason: "active-duty military personnel are three times more likely than civilians to have taken out a payday loan," with such loans costing servicemembers over $80 million in abusive fees annually as of 2005.[5]

11.    And despite Georgia and Illinois statutorily outlawing payday lending, Defendant has offered its short-term, high-cost cash-advance product to Georgia and Illinois residents for years. In violation of both states' laws, Defendant has used its product to extract finance charges drastically exceeding the applicable legal limits.

12.    MoneyLion systematically violates the Truth in Lending Act by failing to make required disclosures concerning the interest rate charged as part of its loan agreements with consumers.

13.    MoneyLion's business practices violate the MLA, TILA, PLA, and PLPA and are part of a systematic nationwide policy and practice. Specialist Lowe, PO Collins, and Sgt. Fuller seek to hold Defendant accountable for its actions and prevent its predatory lending practices from continuing.

## II.    PARTIES

14.    Plaintiff, Specialist Lowe, is an individual, over 18 years of age. At all times relevant, Specialist Lowe was a natural person and a resident of Alabama. He has been a

---

[3] *Id.* at 10–16.
[4] *Id.* at 10–11.
[5] *Id.* at 11.

member of the National Guard since 2008 and is currently a machine mechanic stationed at Fort Benning in Georgia.

15.     During the class period, Specialist Lowe has been a Covered Borrower and an active-duty service member employed by the Army National Guard.

16.     Plaintiff, PO Collins, is an individual, over 18 years of age. At all times relevant, PO Collins was a natural person and resident of Illinois. He has been a member of the U.S. Navy since 2015 and is currently a Petty Officer stationed at Naval Station Great Lakes in Illinois.

17.     During the class period, PO Collins was a Covered Borrower and an active-duty service member employed by the U.S. Navy.

18.     Plaintiff, Sgt. Fuller, is an individual, over 18 years of age. At all times relevant, Sgt. Fuller was a natural person and a resident of Georgia. She has been a member of the U.S. Army since 2018 and is currently a Sergeant stationed at Fort Stewart in Georgia.

19.     During the class period, Sgt. Fuller was a Covered Borrower and an active-duty service member employed by the U.S. Army.

20.     Defendant MoneyLion Technologies Inc. (known until September 2021 as MoneyLion Inc.) is a Delaware corporation headquartered in New York, New York. MoneyLion transacts or has transacted business in this District and throughout the United States. Through its digital-technology platform, including its website and mobile app, MoneyLion has offered, brokered, and extended online loans, engaged in the servicing and collections of such loans, and provided other financial products and services to consumers, as described below.

21.     MoneyLion has offered loan agreements to consumers, including Covered Borrowers, since at least 2013, entering into millions of credit transactions.

### III.    JURISDICTION AND VENUE

22.    This Court has federal question jurisdiction under 28 U.S.C. § 1331. This Amended Complaint alleges federal claims under the MLA and TILA. Under the MLA, "[a]n action for civil liability . . . may be brought in any appropriate United States district court, without regard to the amount in controversy, or in any other court of competent jurisdiction." 10 U.S.C. § 987. Under the TILA, "any action … may be brought in any United States district court, or in any other court of competent jurisdiction." 15 U.S.C. § 1640(e).

23.    The Court has supplemental jurisdiction over the PLA and PLPA claims under 28 U.S.C. § 1367(a), because each claim is "so related to claims in the action within [the Court's] original jurisdiction that they form part of the same case or controversy."

24.    In the alternative, this Court has jurisdiction over the PLA and PLPA claims pursuant to the Class Action Fairness Act 28 U.S.C. § 1332(d), because: (a) this is a class action within the meaning of Rule 23 of the Federal Rules of Civil Procedure; (b) the proposed Illinois and Georgia Class each consist of at least 100 members; (c) at least one member of the proposed Illinois and Georgia Class is a citizen of a state different from MoneyLion; and (d) the amount in controversy as to both the proposed Illinois and Georgia Class exceeds $5,000,000, exclusive of interest and costs, aggregating the claims of all class members.

25.    This Court has personal jurisdiction over Defendant because Defendant conducts business in this State and keeps its headquarters in New York, New York.

26.    Additionally, MoneyLion submits to jurisdiction in this court in its terms of service. Jurisdiction and venue are therefore proper in this Court.

## IV.    LEGAL BACKGROUND

**a.    The MLA Was Specifically Designed to Curb Predatory Payday Loans to Covered Members**

27.    The DoD's Report on lending practices discussed the payday lending industry at length.[6] The Report noted that payday lenders were "heavily concentrated around military bases," with statistics showing that communities with military installations "rank among the most heavily targeted communities in their respective states."[7]

28.    Military populations were targeted for an obvious reason: "active-duty military personnel are three times more likely than civilians to have taken out a payday loan," with such loans costing servicemembers millions in abusive fees.[8] Moreover, the military payment architecture, and the Uniform Code of Military Justice to which servicemembers are bound, make them particularly vulnerable to predatory payday loans:

> Check-holding, a central feature of payday loans, is particularly risky for military borrowers.  Every payday loan involves a prospective "bad" check. Military borrowers are required to maintain bank accounts in order to receive direct deposit of military pay and are subject to the Uniform Code of Military Justice that penalizes deliberately writing a check not covered by funds on deposit.  Borrowers become trapped in repeat borrowing or renewals of loans in order to keep the check used to obtain the loan from bouncing, a key reason that payday loans are debt traps.[9]

29.    Similarly, the "military culture emphasizes financial responsibility, with basic policy explicitly stating that Service members are to pay their just debts."[10]

30.    While the precise EWA product offering was developed somewhat recently, its genre (small-dollar, short-duration, high-cost loans) is nothing new. In 2006, the DoD noted

---

[6] Report, *supra* n.1.
[7] *Id.* at 10–11.
[8] *Id.* at 11.
[9] *Id.* at 14. To be sure, EWA providers like MoneyLion do not collect physical checks from their customers at loan initiation but instead take a virtual check by requiring Covered Members to authorize automatic debits from bank accounts to repay their loans.
[10] *Id.* at 10.

military "borrowers encounter[ed] a booming virtual market of small loan offers, payday loans, and 'military loans' via the Internet."[11] Those loans, like MoneyLion's, "are delivered and collected online through electronic fund transfer." [12]

31.    The Report noted key similarities between the various predatory lending products—including payday loans and internet loans—that target the military, which accurately encapsulate MoneyLion's business model:

> (1) Predatory lenders seek out young and financially inexperienced borrowers who have bank accounts and steady jobs, but also have little in savings, flawed credit or have hit their credit limit.  These borrowers are less likely to weigh the predatory loan against other opportunities and are less likely to be concerned about the consequences of taking the loan.

> (2) Predatory lenders make loans based on access to assets (through checks, bank accounts, car titles, tax refunds, etc.) and guaranteed continued income, but not on the ability of the borrower to repay the loan without experiencing further financial problems.[13]

> (3) . . . Increasingly the Internet is used to promote loans to Service members.

> (4) Predatory products feature high fees/interest rates, with some requiring balloon payments, while others pack excessive charges into the product. The result of their efforts is to obfuscate the comparative cost of their product with other options available to the borrower.

> . . .

> (6) Predatory lenders attempt to work outside of established usury limits, either by attempting to obtain exemptions from federal and state statutes or by developing schemes designed to circumvent existing laws.[14]

32.    The Report further found "high interest loans, whether provided as a payday loan, military installment loan, or as a result of unscrupulous automobile financing can leave

---

[11] *Id.* at 15.
[12] *Id.* at 16.
[13] To that end, lenders' "use of checks, access to bank accounts, [and similar other methods of extracting repayment] pressure the borrow to consider loan payments as being their top priority." *Id.* at 44.
[14] *Id.* at 21–22.

a Service member with enormous debt, family problems, difficulty maintaining personal readiness and a tarnished career."[15] As if being trapped in a debt cycle is not bad enough, some servicemember victims of payday and other lenders experienced disciplinary action (ranging from reprimands to "loss of promotions and separation from the military") as a result of their financial hardship.[16]

33.    Drawing from the bountiful evidence of servicemember abuse at the hands of predatory lenders, the DoD concluded it could not "prevent predatory lending without assistance from Congress, the state legislatures, and federal and state enforcement agencies."[17]

34.    To curb usurious interest rates, excessive APRs, and bogus fees, the DoD requested legislation that would prevent lenders from preying on service members and endangering the nation's military readiness.[18]

35.    The American Bar Association and others expressed support for the DoD's request, noting the urgent need for remedial Congressional action to curb predatory loan practices harming servicemembers. The legislation requested was supported by the DoD, military and veterans organizations, legal aid organizations, consumer advocacy groups, faith-based organizations, and of course lawmakers.

36.    Congress answered the call and passed the MLA to protect Covered Borrowers from unfair, deceptive, and excessively priced loans.

---

[15] *Id.* at 39.

[16] *Id.* at 41–42.

[17] *Id.* at 46.

[18] Specifically, the DoD requested legislation protecting Service members "from unfair, deceptive lending practices and usurious interest rates and to require uniform disclosure of credit and terms. Specifically, lenders should not be permitted to base loans on prospective bad checks, electronic access to bank accounts, mandatory military allotments, or titles to vehicles. All costs involved in borrowing should be included in interest rate calculations and disclosures. Laws and regulations must be changed to close regulatory loopholes that leave non-resident military borrowers unprotected in many states." *Id.*

b.    **The Military Lending Act**

37.    In the wake of the DoD's investigations, in 2006, the Military Lending Act, 10 U.S.C. § 987 *et seq.*, was enacted.

38.    The MLA makes it unlawful for a creditor to "impose an annual percentage rate of interest greater than 36 percent with respect to the consumer credit extended to a Covered Member or a dependent of a Covered Member." 10 U.S.C. § 987(b).

39.    The MLA also requires mandatory disclosures in "consumer credit" [19] transactions with Covered Borrowers, which include:

- A statement of the annual percentage rate of interest applicable to the extension of credit, 10 U.S.C. § 987(c)(1)(A);

- Any disclosures required under the Truth in Lending Act, 10 U.S.C. § 987(c)(1)(B); and

- A clear description of the payment obligations of the member or dependent, as applicable, 10 U.S.C. § 987(c)(1)(C).

40.    Additionally, the MLA prohibits creditors from including provisions in a consumer-credit transaction that require the Covered Borrower to submit to arbitration or to waive the borrower's right to legal recourse. 10 U.S.C. § 987(e).

41.    Additionally, the MLA prohibits lenders from using a check or other method of access to a deposit, savings, or other financial account maintained by the borrower as security for an obligation.

---

[19] Under the MLA, consumer credit is defined as "credit offered or extended to a Covered Borrower primarily for personal, family, or household purposes," subject to a finance charge or payable by written agreement in more than four installments and outside the ambit of any of the identified exceptions.

c.    **The Truth in Lending Act**

42.    The Truth in Lending Act, codified at 15 U.S.C. § 1638, protects consumers by, *inter alia*, (i) requiring lenders to clearly disclose all terms and costs associated with loans, (ii) allowing borrowers to easily compare different credit options, and (iii) preventing predatory lending practices by making loan details transparent and standardized. In essence, TILA promotes informed use of consumer credit by providing full disclosure of loan terms.

43.    Under TILA, creditors are required to make certain disclosures when participating in closed-end credit transactions, such as those MoneyLion offers here. MoneyLion fails to make any of the following required disclosures:

- "The 'amount financed', using that term, which shall be the amount of credit of which the consumer has actual use," 15 U.S.C. § 1638(2)(A);

- "a statement of the consumer's right to obtain, upon a written request, a written itemization of the amount financed," *id.* at § 1638(2)(B);

- "The 'finance charge', not itemized, using that term," *id.* at § 1638(3);

- "The finance charge expressed as an 'annual percentage rate', using that term," *id.* at § 1638(4);

- "The number, amount, and due dates or period of payments scheduled to repay the total of payments," *id.* at § 1638(6);

- "Descriptive explanations of the terms 'amount financed', 'finance charge', 'annual percentage rate', 'total of payments', and 'total sale price' as specified by the Bureau," *id.* at § 1638(8);

- "Where the credit is secured, a statement that a security interest has been taken in (A) the property which is purchased as part of the credit transaction, or (B)

property not purchased as part of the credit transaction identified by item or type," *id.* at § 1638(9);

- "A statement indicating whether or not the consumer is entitled to a rebate of any finance charge upon refinancing or prepayment in full pursuant to acceleration or otherwise, if the obligation involves a precomputed finance charge," *id.* at § 1638(11); and

- "A statement that the consumer should refer to the appropriate contract document for any information such document provides about nonpayment, default, the right to accelerate the maturity of the debt, and prepayment rebates and penalties," *id.* at § 1638(12).

**d.    The Georgia Payday Lending Act**

44.    Payday lending involves offering short-term loans, often for small amounts, with repayment expected on the borrower's next payday. These loans are frequently marketed as a quick solution for bridging financial gaps between paychecks.

45.    Payday loans are not a new invention; they have been offered for decades. While they have taken many forms, one of the unifying characteristics of payday lending has been that lenders have created different artifices, evolving contractual arrangements, and inventive structures to evade usury caps.

46.    In the past, lenders operating in Georgia and elsewhere disguised payday loans as "wage buying," where lenders claimed to be purchasing earned wages, although in reality they were simply issuing loans at usurious rates.

47.    Georgia's first major legislative enactment aimed at stopping payday lending was the Industrial Loan Act ("ILA"). The legislation was passed because short-term, high-cost loans trap consumers in a cycle of debt. The cycle perpetuates itself because fees charged in

conjunction with payday loans reduce borrowers' paychecks and net pay each period, necessitating borrowers to obtain new loans to cover the shortfall created by the original loans.

48.     Notwithstanding the ILA, payday lending made a resurgence in the late 1990s and 2000s in newly structured transactions, such as deferred presentments, in which the lender advanced money in exchange for a postdated check, which it agreed not to cash until a specified future date (typically the borrower's next payday).

49.     In response to the scourge of "short-term cash advances" making a comeback in Georgia, the Attorney General issued Official Opinion 2002-3 that addressed the practices of "many lenders" who had "developed schemes intended to disguise the true character of the payday loan transaction." The Attorney General observed that "Payday loans have been recognized by many courts, in Georgia and elsewhere, as a pretext for usury" and warned that the then-novel disguised payday loans were illegal under Georgia law.

50.     Notwithstanding the ILA and Attorney General opinion condemning disguised payday lending, the practice persisted in the state. To stop these evasions, in 2004, Georgia enacted the Payday Lending Act ("PLA").

51.     The PLA "encompasses all transactions in which funds are advanced to be repaid at a later date, notwithstanding the fact that the transaction contains one or more other elements." O.C.G.A. § 16-17-1(a). The PLA prohibits lenders from collecting any amounts on payday loans, deems payday loans void and unenforceable, and subjects payday lenders to liability for statutory damages in an amount equal to three times any charges made on an illegal payday loan, *id.* § 16-17-3.

52.     As history teaches, payday lending is simply too profitable an enterprise for some lenders to resist. EWA products represent the newest generation artifice to attempt to

evade Georgia usury law and bilk consumers through a short-term, high-cost payday loan product.

53.     EWA providers' cash-advance loan products (including MoneyLion's) offer cash to borrowers in return for the authorization to debit the borrower's bank account on their payday in an amount equal to the principal cash-advance loan amount and any additional charges.

54.     Defendant's Instacash product falls within the scope of the PLA because it is a "transaction[] in which funds are advanced to be repaid at a later date." O.C.G.A. § 16-17-1(a).

     **e.**     **The Illinois Predatory Loan Prevention Act**

55.     Before 2021, Illinois law permitted payday lenders to charge triple-digit annual percentage rates (APRs)—often 300% or more—on small-dollar, short-term loans.

56.     Myriad studies showed that the vast majority of payday lending in Illinois came from repeat borrowers. The high-fee, short-term nature of payday loans traps users in a cycle of debt, perpetuating the ever-growing need for additional borrowing and associated fees.

57.     Despite prior regulatory efforts, payday lending remained a significant source of economic harm and societal inequity, prompting legislative action to address these systemic issues. By the time the PLPA was enacted, the public and legislative consensus had grown that the payday lending model—high fees, short terms, repeat borrowing—was structurally predatory and disproportionately harmful to vulnerable people and communities.

58.     The Illinois Predatory Loan Prevention Act, signed into law in March 2021, represents a landmark reform aimed at eradicating predatory payday lending in the state.

59.     The PLPA established a clear 36% APR cap on all consumer loans, including payday, auto title, and installment loans.

14

60.    The PLPA is broad in scope and expressly prohibits evasion of its mandates. That is, the PLPA states, "No person or entity may engage in any device, subterfuge, or pretense to evade the requirements of this Act, including, but not limited to" "disguis[ing]" loans as non-loan transactions.

61.    Additionally, the PLPA contains a provision that expressly forbids a waiver of "any provision" of the Act.

62.    The PLPA was expressly modeled after the Military Lending Act. Indeed, 815 ILCS 123/15-1-5 states the "purpose of th[e PLPA] is to protect consumers from predatory loans consistent with federal law and the Military Lending Act[.]"

63.    A press release from the governor's office noted: "While the existing federal law [*i.e.*, the MLA] already protects active-duty military with a 36 percent APR cap, this legislation would extend the same protection to Illinois veterans and all other consumers."[20]

64.    The same press release emphasized "Illinois families pay over $500 million per year in payday and title loan fees, which is the fourth highest in the nation," and that the PLPA would serve the righteous purpose of "provid[ing] families with more economic stability."

65.    The PLPA applies to "loans," which it defines broadly to mean "money or credit provided to a consumer in exchange for the consumer's agreement to a certain set of terms, including, but not limited to, any finance charges, interest, or other conditions." 815 ILCS 123/15-1-10. The definition includes both closed-end and open-end credit agreements and "any transaction conducted via any medium whatsoever." *Id.*

---

[20] *Gov. Pritzker Signs Equity-Centric Legislation Expanding Economic Access and Opportunity Across Illinois*, ILL. DEP'T OF FIN. & PROF. REG. (Mar. 23, 2021), https://idfpr.illinois.gov/content/dam/soi/en/web/idfpr/news/2021/2021-03-23-predatory-loan-prevention-and-cra.pdf.

15

66.     The PLPA delegates to the Illinois Department of Financial and Professional Regulation (the "DFPR") the authority to draft, adopt, and enforce administrative rules ensuring lenders comply with the act.

67.     When the PLPA was enacted, the DFPR issued a press release noting the "PLPA covers many types of consumer loans, which include . . . *wage advance products*" like MoneyLion's Instacash product.[21]

68.     A violation of the PLPA "constitutes a violation of the Consumer Fraud and Deceptive Business Practices Act." 815 ILCS 123/15-10-5(b).

## V.     FACTS

### a.     The Earned Wage Product Market and MoneyLion

#### i.     EWA Products Charge High Fees and Wreak Havoc on Borrowers' Financial Health

69.     A significant driver of demand for consumer credit and financial products stems from the mismatch between when a family receives income and when they pay expenses. Employees generally provide services before being paid for their labor and are typically paid in arrears on a biweekly or semi-monthly cycle. To meet liquidity challenges, consumers have for years turned to credit cards, personal installment loans, and payday loans.

70.     Recently, an old product with new packaging—coined "earned wage access" or "earned wage advance"—was created and offered to consumers to address the same need. While marketed as a novel financial technology ("fintech") device, in practice, EWA products are garden variety cash advances.

---

[21] *See IDFPR Releases Consumer Frequently Asked Questions About the Predatory Loan Prevention Act*, Ill. Dep't Fin. & Prof. Reg'n (Apr. 30, 2021), attached hereto as Exhibit 1.

71.     EWA products provide workers, before their payday, with funds that purport to equal or approximate a portion of their unpaid wages. Loaned funds are repaid via automated withdrawal from the consumer's bank account.

72.     Defendant MoneyLion is one of the fintech companies that provides an EWA product, which it calls "Instacash." According to MoneyLion, "Instacash provides cash advance(s) to you from time to time, in MoneyLion's sole discretion, based on your anticipated recurring direct deposits (each such advance, an '**Instacash Advance'**)."

73.     To repay these loans, borrowers must authorize MoneyLion to charge their debit card or initiate an electronic fund transfer from a bank account.[22] MoneyLion requires users to authorize MoneyLion to "debit your backup payment method for the remaining amount to be repaid" if their primary repayment method fails due to insufficient funds.[23]

74.     MoneyLion advertises its products as "free money," "no interest," and "interest-free" while obscuring the ways in which it bilks consumers for fees and other finance charges that add up to loan-shark rates.

75.     MoneyLion is paid through two types of fees: (1) expedite fees, and (2) so-called "tips."

76.     First, **expedite fees** (referred to by MoneyLion as "Turbo delivery fees") are charged to provide instant access to loan funds.

---

[22] *Id.*; *see also MoneyLion Instacash*, https://www.moneylion.com/cash-advance/instacash (last visited Mar. 13, 2025) ("Instacash repayments are automated, making it easy to pay on your scheduled repayment date and replenish your Instacash so it's ready when you need it next! On each scheduled repayment date, the amount of Instacash you received and any related optional Tips and optional Turbo Fees will be automatically deducted from your authorized payment account or debit card.").
[23] *Id.*

77.    To obtain funds immediately, borrowers must pay a Turbo delivery fee. If a borrower declines to pay the fee, their cash advance is delivered sometime 1–5 business days after funds are requested.

78.    As shown in the below fee table, the amount of the expedite fee increases with the size of the loan, similar to interest on traditional loans:



*Figure 1*

79.    The actual cost to provide customers with instant access to funds to an external account is less than $0.05.[24]

80.    What's more, there is no difference at all in cost to provide immediate access to loaned funds in a MoneyLion "RoarMoney" account since MoneyLion controls those accounts (so there is no external transfer necessary). Notwithstanding there being no cost difference to MoneyLion to provide funds instantly or in days, MoneyLion artificially slows deposits for

---

[24] *Simple, Transparent, Uniform Pricing for All Financial Institutions*, THE CLEARINGHOUSE (showing cost of RTP instant credit transfer at $0.045), available at https://www.theclearinghouse.org/-/media/new/tch/documents/payment-systems/rtp_-pricing_02-07-2019.pdf.

fee-free Instacash advances to RoarMoney accounts in order to encourage the payment of Turbo fees.

81.    The speed of access to funds is an essential and defining aspect of MoneyLion's Instacash product—indeed its name, "Instacash" reinforces the intended "instant" nature of the cash advances. Instacash was designed to address—and is marketed as addressing—what is generally a less-than two-week liquidity problem.

82.    MoneyLion's website includes numerous representations about the speed of access to funds, like "Get Cash Today," "get paid today," "Get Paid Any Day," "Available in minutes." Other advertisements promote Instacash as a solution to pay when emergencies arise, such as an "unexpected parking ticket, a sudden car breakdown, a leaky roof, or a last-minute dinner party." But these ads often do not mention whether fees are necessary to obtain cash immediately.

83.    The necessity for instant access to funds is heightened by the extraordinarily brief loan duration of Instacash loans. Indeed, a recent study found that the average loan term for EWA loans was only ten days.[25] Likewise, the most common term for MoneyLion's Instacash product is ten days. Consumers who cannot wait ten days to access their wages certainly will pay whatever fees are charged to obtain their funds as quickly as possible. As a result, the vast majority of EWA users pay expedite fees to obtain immediate funds disbursement.[26]

---

[25] Lucia Constantine, Christelle Bamona, Sara Weiss, *Not Free: The Large Hidden Costs of Small-Dollar Loans Made Through Cash Advance Apps*, CTR. FOR RESPONSIBLE LENDING, at 10 (Apr. 2024) (hereinafter "*Not Free*").

[26] One recent survey found 79% of EWA users typically paid expedite fees to receive funds faster. *Not Free*, at 3. Likewise, the Consumer Financial Protection Bureau found 96% of fees paid by consumers using employer-integrated EWA providers were for expedite fees. Consumer Financial Protection Bureau, Data Spotlight: Developments in the Paycheck Advance Market (July 18, 2024), https://www.consumerfinance.gov/data-research/research-reports/data-spotlight-developments-in-the-paycheck-advance-market/.

84.     MoneyLion has designed a user interface in its app to steer users toward paying Turbo delivery fees on each Instacash transaction by pre-selecting the fee option. For instance, a user who attempts to obtain an Instacash advance will see a screen with the Turbo delivery option preselected, which would result in the assessment of a fee, and directs users to "Confirm" that choice with a large green button:



*Figure 2*

Notably, the current check out screen (shown above) does not expressly disclose that a Turbo fee is charged, let alone in what amount. Instead, the amount of the Turbo fee is concealed within the total repayment amount. The Turbo fee can only be removed by navigating to a new screen—first, by clicking the link next to the "Send to" field, and second, by changing the "destination" of the payment to "Standard" delivery which MoneyLion represents will take "2-5 business days" (which equates to 20%–50% *or more* of the typical loan term).

20

85.     MoneyLion has discouraged users from opting out of paying Turbo fees by, for example, showing users who choose not to pay a fee an extra screen in the app re-emphasizing the ability to obtain cash immediately with the payment of a fee and allowing users to change back to the fee option with a single click.

86.     MoneyLion has been remarkably successful at extracting Turbo fees from its consumers in Instacash transactions—between 2018 and 2023, MoneyLion received an expedite fee on approximately 90% of all Instacash transactions.

87.     While expedite fees are notionally optional and users can use an EWA product without paying one, they are difficult to access and negate their usefulness to consumers. For instance, the free, non-expedited version of a MoneyLion cash advance will take up to five (5) days to be delivered in the borrower's account. Conversely, the expedited service takes just a few minutes. This delay is problematic for MoneyLion's intended users, consumers living paycheck to paycheck who turn to Instacash for the precise reason that their need for cash is urgent and cannot wait.

88.     Turning to the second type of fee, "**tips**" are simply additional funds MoneyLion prompts borrowers to pay.

89.     These purported "tips" serve no purpose whatsoever to borrowers and instead go directly to MoneyLion's bottom line.

90.     MoneyLion deploys techniques borrowed from behavioral economics to pressure users into tipping each time they obtain an Instacash loan. Along these lines, the California Department of Financial Protection and Innovation ("DFPI") listed "multiple strategies that [EWA] lenders use to make tips almost as certain as required fees," including "[s]etting default tips and using other user interface elements to mak[e] tipping hard to avoid; [m]aking it difficult to set a $0 tip or not advertising that a particular payment is optional; and

[c]laiming that tips are used to help other vulnerable consumers or for charitable contributions."[27]

91.    MoneyLion weaponizes each of these strategies against its borrowers to secure tips, and to great effect. For instance, in-app screens push users to tip by presenting pre-selected and suggested tip levels that are difficult to un-select (*i.e.*, users must navigate drop-down menus or visit separate screens to remove the suggested tip).

92.    MoneyLion predetermines the amount it will suggest (and pre-select) a user to tip. At the beginning, the default tip was $5.00. Over the years, MoneyLion transitioned to a dynamic model that adjusts the amount of the preselected tip based on the size of the Instacash advance requested and personalized to the individual user. Invariably, the preselected tip is never $0.

93.    MoneyLion internally refers to the pre-selected tip as a "tip anchor," an explicit reference to "anchoring," a cognitive bias well-known to psychologists referring to the tendency of individuals to rely too heavily on the first piece of information encountered (the "anchor") when making decisions, even if that information is irrelevant or inaccurate.

94.    In addition to anchoring, MoneyLion requests tips repeatedly and at different steps in the Instacash product cycle.

95.    MoneyLion continually analyzes, tests, and iterates the Instacash program to maximize tip levels. According to its business plans, MoneyLion engages in "behavioral nudges and messaging" to encourage tipping.

---

[27] *2021 Earned Wage Access Findings*, CAL. DEP'T FIN. PROTEC. & INNOVATION, at 61–62 (March 2023), https://dfpi.ca.gov/wp-content/uploads/sites/337/2023/03/PRO-01-21-ISOR.pdf.

96.    One example of MoneyLion's "behavioral nudges" can be seen in the tip screens MoneyLion shows to customers who successfully reset the preselected tip to $0, like those below:



*Figure 3*                    *Figure 4*

97.    Through these "friction screens," MoneyLion pressures users to tip with implicit threats that the user may lose access to Instacash ("Instacash doesn't grow on trees"), attempting to elicit guilt for not tipping ("Looks like we didn't get a tip last time!" and "Are you sure?"), and anchoring users' expectations with specific tip recommendations.

98.    Another behavioral nudge is deployed against borrowers who previously declined to tip—such users are shown "retargeting screens" at the start of the Instacash request process the next time they request an Instacash loan:



*Figure 5*          *Figure 6*

99.    The purpose of the friction and retargeting screens, according to internal communications, is to "improve instacash tipping rates."

100.    Despite the "voluntary" nature and uselessness of tips, Instacash users paid MoneyLion tips on approximately 40% of all Instacash advances taken as a result of MoneyLion's incessant tip requests and scientifically-engineered and iterated behavioral tactics.

101.    When properly viewing EWA products' tips and expedite fees as costs of credit (*i.e.* finance charges), the APRs for these loans are eye-popping.

102.    A recent study found the average APR imposed by EWA providers (that collect tips and expedite fees) is 334%, in line with payday loans:

24



*Figure 7*

103.    The APR received by MoneyLion for its Instacash product is similar, though sometimes *much higher*. Between 2018 and 2023, the most common Instacash advance was for $50, the most common fee was $4.99, and the most common tip was $2.00. Combining these components to construct a typical Instacash advance, the annualized cost of credit is more than 350% APR.

104.    As discussed below, some of MoneyLion's loans to Plaintiffs were even more expensive, with multiple loans bearing APRs exceeding **1,000%**. *See infra*.

105.    Ironically, MoneyLion and other EWA providers market their products as low-cost alternatives to payday loans.[28] In truth, MoneyLion is a wolf in sheep's clothing: extending loans with APRs nearly identical to the exorbitantly-priced payday loans it claims to replace.

---

[28] *What Do You Need for a Payday Loan*, MONEYLION.COM: BORROW (Feb. 21, 2025), https://www.moneylion.com/learn/what-do-you-need-for-a-payday-loan/ (characterizing EWA products as a "safer alternative" to a payday loan); *see id.* ("Access funds directly from your paycheck without the high fees of payday loans.").

### ii.    MoneyLion uses Instacash to Trap Users in a Cycle of Reborrowing

106.    To achieve the maximum profits possible from its financially struggling user base, MoneyLion uses various strategies to ensure users take as many Instacash advances (and pay attendant fees each time) as possible and come back each pay period for more.

107.    In service of that need, MoneyLion limits the amount a borrower can access per advance, while simultaneously allowing multiple advances per day and per pay period, thereby fostering repeat withdrawals and concomitant repeated payment of expedite fees and tips.

108.    MoneyLion limits the amount its customers can borrow on a daily and per pay period basis. The limitations (the "Instacash limit") vary depending on the borrower's "anticipated income amount" and whether the borrower has their loan proceeds delivered to an external account or deposited in a "RoarMoney account." Many borrowers, including Plaintiffs, are permitted to borrow $500 or more per day but only in $100 increments, meaning a borrower paying a Turbo fee on five loans transferred to an external account would pay a whopping $44.95 *in Turbo fees alone* for access to a short-term $500 cash advance.

109.    Recently, MoneyLion has developed and deployed a "Boost" program—which allows users to access temporary increases in Instacash funds available—in an effort to increase Instacash usage (and payment of the attendant fees). MoneyLion sends notifications to users encouraging them to use boost frequently, often in advance of holidays or other events associated with consumer spending, like Valentine's Day or the Super Bowl. Below is an example of one such promotion:



*Figure 8*

110.    The boost program has proven effective at increasing Instacash usage—so effective that MoneyLion has initiated boost campaigns on short notice in response to periods in which Instacash revenues did not meet expectations.

111.    Instacash's architecture encouraging repeat borrowing maximizes fees for MoneyLion, while creating a debt trap for vulnerable consumers. For users who obtain multiple advances, their obligation to repay principal and interest on all their outstanding loans depletes their income each pay period, reducing their ability to cover expenses and necessitating additional Instacash advances to cover the shortfall. This creates a cycle of reborrowing that is foundational to MoneyLion's business model.

112.    "By imposing limitations on how much can be borrowed in a single advance, while allowing more than one advance per pay period, lenders force borrowers to take out multiple advances—and pay multiple fees—to access more money. The business model

capitalizes on most borrowers' financial precarity, and the user interface of these products makes paying a fee or leaving a tip difficult to avoid."[29]

113.    MoneyLion has succeeded at nurturing a user base dependent on repeated Instacash borrowing. According to a 2023 analysis, MoneyLion estimates up to 40% of its users pay fees for 10 or more Instacash transactions *per month*. As a result, more than 44% of fees and tips paid to MoneyLion are paid by users who obtain at least two Instacash loans per week. In short, users who are struggling the most with their finances—and utterly dependent on repeat borrowing to stay afloat—contribute the most to MoneyLion's revenues and profits.

114.    The end result is a product that traps consumers in cycles of debt, worsens their financial circumstances, leads to more overdraft fees, and leads to an ever-increasing reliance on emergency funds from—and the fees that come with—Instacash loans.

115.    An analysis by the Center for Responsible Lending ("CRL") found consumers who used EWA products took out advances repeatedly, with many taking advances on the same day or the day after repayment and were consequently more likely to overdraft their accounts and be forced to pay overdraft fees. Specifically, the CRL found that 27% of EWA users take out at least 25 loan advances a year, and for 33% of users, the vast majority (80%) of their borrowing is followed by reborrowing within two weeks.[30] This suggests that receiving a reduced paycheck (*i.e.*, reduced to pay back EWA loans and fees) necessitated taking out more advances in the following pay period.

---

[29] Candice Wang, Lucia Constantine, Monica Burks, Yasmin Farahi, *A Loan Shark In Your Pocket: The Perils of Earned Wage Advance*, CTR. FOR RESPONSIBLE LENDING, at 7 (Oct. 2024) (hereinafter "*Loan Shark*").
[30] *Loan Shark*, *supra* note 29, at 7.

116.    Another CRL study found that using EWA products is closely correlated with overdraft fees. "Overdrafts on consumers' checking accounts increased 56% on average after use of an advance product."[31]

### iii.    MoneyLion Utilizes Strict Underwriting Procedures and, Consequently, Almost Always Collects

117.    While MoneyLion's Instacash product is financially disastrous for users, it has proven profitable for MoneyLion. MoneyLion maximizes profits by using exacting underwriting procedures that ensure cash advances, and the fees that accompany them, are timely repaid through automated bank account debits that borrowers authorize when taking out the loans.

118.    MoneyLion has various criteria borrowers must meet to be eligible for an Instacash advance. For instance, prospective borrowers must link a bank account to the MoneyLion app and that account must (1) have been active for at least sixty days, (2) receive regularly scheduled income deposits—which in turn must be payroll-related, government benefits, or pension payments—and (3) be registered to the MoneyLion accountholder.

119.    A borrower must demonstrate consistent income, generally at least three recurring direct deposits from the same source to the linked bank account.

120.    MoneyLion routinely rejects applicants whom it deems insufficiently creditworthy. Reasons for rejection include failure to link an account, irregular paychecks, not enough transaction history, or missed payments on other loan products.

121.    MoneyLion takes steps to verify its borrowers' consistent income by obtaining and reviewing troves of financial data in qualifying consumers for Instacash advances.

---

[31] *Not Free*, *supra* note 25, at 6.

122.    To determine whether a borrower is creditworthy and decide how much credit to extend in the first place, MoneyLion requires users to connect their bank account to MoneyLion through Plaid. Plaid is a financial services provider that partners with MoneyLion and other fintech companies to allow them to view customer bank account data. Plaid allows MoneyLion to "[q]uickly verify assets and income" of borrowers, providing "real-time insights into a borrower's income and employment in seconds with a breakdown of earnings from salaries, gig work, and more."[32]

123.    In addition to using Plaid to peruse borrower bank accounts, MoneyLion requires borrowers provide it direct access to their payroll records using "Pinwheel." Pinwheel is another financial services company that provides "real-time income and employment verifications" to enable "underwriting with verified data – directly from the source of truth."[33] In short, through the payroll records obtained through Plaid and Pinwheel, MoneyLion obtains a "full income picture" of its borrowers in "real-time." [34] MoneyLion thus knows precisely when and how much its borrowers will be paid before they are paid, and is given advance notice of income changes (*i.e.*, in the event a borrower gets a raise or pay cut, quits or is fired) that affect the likelihood of MoneyLion's loans being repaid.

124.    MoneyLion uses its real-time insight into customer financials to ensure borrowers will have sufficient funds to repay their loans on payday (*i.e.*, in the underwriting process) and to schedule its repayment debits as soon as payday hits, ensuring their loans are paid as soon as funds become available.

---

[32] *Plaid Solutions: Credit*, Plaid.com, https://plaid.com/solutions/credit/ (last visited Mar. 13, 2025).
[33]    Pinwheel, *Real Time Income and Employment Verifications*, https://www.pinwheelapi.com/products/verify-income-employment (last visited Mar. 13, 2025).
[34] *Id.*

125.    MoneyLion's underwriting process is both detailed and continual. MoneyLion constantly adjusts maximum withdrawal amounts—both daily and per pay period—depending on the individual's borrowing history and financial health.

126.    For borrowers who qualify, MoneyLion monitors their financial health to determine how much credit to extend based on borrowers' need and ability to repay. In determining how much credit to extend, MoneyLion considers a variety of factors including the consistency of deposits, the borrowers' history of paying back Instacash loans, bank account balances, account activity, and other factors.

127.    Through its constant underwriting process, MoneyLion extends loans to borrowers only when it is confident they will repay.

128.    For qualifying borrowers, MoneyLion generally begins by offering relatively low amounts of credit, with new borrowers unlocking "a minimum of $10 after linking your external deposit account." Borrowers obtain greater access to credit—*i.e.*, MoneyLion raises their maximum loan limit—by consistently paying off loans to MoneyLion on time and generally improving their financial health (which MoneyLion monitors by directly viewing borrowers' financial and payroll data).[35]

129.    Additionally, changes to financial factors, such as "a shift in the regularity of detectable recurring deposits, a salary increase, a salary decrease," more or fewer deposits, or "other factors" may result in changes to a borrower's Instacash limit. At bottom, "the more

---

[35] *See, e.g., Why Amounts and Limits May Change*, Moneylion.com, https://www.moneylion.com/resources/why-amounts-and-limits-may-change/#:~:text=Instacash%20is%20an%20optional%20service,factors%20as%20determinde%20by%20MoneyLion (last visited Mar. 17, 2025) (explaining borrowers may increase their loan limits by demonstrating consistent income and may "boost" their credit limit by "making two or more consecutive on-time payments").

money you have coming into your account that [MoneyLion] can verify, the greater likelihood you'll qualify for more Instacash."[36]

130.     These underwriting methodologies—extending credit only to those who will repay, and only in amounts that are likely to be repaid—are precisely the same methods used by traditional credit issuers, like banks. "US credit card lenders individualize interest rates and credit limits according to assessments of customers' default risk."[37] The only distinction—that traditional lenders review credit scores and borrowers' applications to determine creditworthiness while EWA providers like MoneyLion directly review borrowers' financial accounts—is one without a difference.

131.     In sum, MoneyLion's underwriting process requires, before any money changes hands, that borrowers: (1) demonstrate they are employed and regularly paid through that employment; (2) link the bank account to which paychecks are deposited to MoneyLion's app through Plaid; (3) connect at least one method of repayment (more are "highly encouraged"); (4) connect the MoneyLion application to their payroll records through Pinwheel; (5) authorize MoneyLion to automatically debit the linked accounts on the borrower's payday in an amount that is equal to the cash advance the borrower receives (the principal loan amount) plus fees and tips; and (6) be current on all prior MoneyLion Instacash loans. Borrowers who fail to complete these steps cannot obtain cash advances.

---

[36] *Id.*
[37] Matcham, *Risk-Based Borrowing Limits in Credit Card Markets* (Mar. 10, 2015), https://willmatcham.com/img/main_rbbl_matcham_2024_08_15.pdf; *see also* Dey, Mumy, *Determinants of Borrowing Limits on Credit Cards*, Fed. Reserve Bank of Boston (2006), ("Publicly available information about borrowers' creditworthiness helps banks sort their client pool into broad risk classes by way of their credit scoring systems. . . . Profit-maximizing banks choose to provide exactly the amount of credit to their borrowers that maximize their expected profits."), https://www.bostonfed.org/-/media/Documents/events/payment-choice/papers/Dey.pdf; *What are credit limits?*, Armed Forces Bank (Apr. 4, 2024) ("Financial institutions grant credit limits that allow you to use credit . . . while ensuring you can manage your payments."), https://www.afbank.com/article/what-are-credit-limits-and-how-are-they-determined.

132.    In addition to these loan qualification procedures, borrowers must link a bank account and debit card to their MoneyLion profile to ensure seamless repayment.

133.    Users must "agree to our Automatic Debit Authorization agreement" which "authorizes MoneyLion to debit the chosen payment method on the scheduled repayment date." MoneyLion refers to its automated debit process as "automated collections" or "automated retry logic," which is an essential component of its "collections process."

134.    Repayments are "typically aligned with the next payday, where the advanced amount is automatically deducted from the paycheck deposited into the employee's bank account."

135.    Since before the product was launched, MoneyLion has strived to optimize its "due date prediction" processes to ensure Instacash repayments are drawn as soon as funds become available. Internal documents reflect that MoneyLion constantly refines its model "to smoothen [direct deposit] detection/predictions" to ensure repayment. According to MoneyLion officials, the goal is an "architecture to be able to detect individual [direct deposits] in near real-time."

136.    Users must also authorize MoneyLion to make repeated attempts to process repayments in the event the account from which repayments are drawn lacks sufficient funds. MoneyLion uses its authorizations aggressively to collect repayment—its training materials direct employees to "retry payments every day until repaid" and state if "there is not enough in the customer's accounts, we may take a partial repayment and try again the next day."

137.    To further improve the effectiveness of its collections program, MoneyLion makes it nearly impossible to avoid repayment, notwithstanding its claim (*see infra*) that Instacash advances do not come with an obligation to repay.

138.    First, if a customer is unable to repay a loan, MoneyLion prevents them from using the product—which cash-strapped customers are usually *dependent on*—until the loan is repaid.

139.    Second, MoneyLion makes the process of revoking debit authorization unnecessarily difficult. When Instacash was launched, users had to provide *written* notice to MoneyLion of debit authorization revocation even though substantially all other interactions occurred through the MoneyLion app.

140.    Today, although there is a revocation process through the app, the process is poorly explained, not highlighted, and difficult to navigate. Unlike the one-click process that makes receiving Instacash advances fast and seamless, there is no clearly delineated button or pathway to revoke debit authorization. Rather, users must navigate a complex process across multiple menus to de-link each authorized payment method associated with their account.

141.    Relatedly, MoneyLion requires users to provide three business days' notice before it will honor a user's revocation of debit authorization. Considering the extremely short duration of Instacash loans, the notice requirement makes revocation difficult, if not entirely impossible for Instacash users receiving short-term loans.

142.    Furthermore, users who successfully de-link their payment methods to avoid repayment render the MoneyLion app effectively useless (as doing so cuts off their access to Instacash and other features in the app that require payment), and users with a MoneyLion bank account must effectively give up those accounts to revoke authorizations.

143.    Through these underwriting and collections procedures and policies, MoneyLion ensures it will be able to automatically deduct the sum of the cash-advance loan amount (the loan principal), plus any additional charges, from the linked account as soon as the borrower's employer deposits the borrower's next paycheck.

144.    These methods are so successful that lenders recoup their advances at least 97% of the time using these tactics.[38]

145.    MoneyLion has achieved similar success through its "collections" program. In its most recent 10-K filing to the SEC, MoneyLion stated "the non-repayment rate for advances provided through our Instacash product was 4.0%."[39] And even this 96% collection rate likely *underestimates* the effectiveness of its collection efforts as to bona fide users. The State of New York alleged in its enforcement action that MoneyLion's collection rate among users who had fewer than five (5) Instacash accounts associated with their phone (*i.e.*, stripping out apparent fraud) was nearly 98%.

**b. MoneyLion Seeks to Avoid Regulation Applicable to Consumer Credit and Lending Products Through its "Non-Recourse" Claims**

146.    In a transparent attempt to avoid usury restrictions and other laws and regulations applicable to consumer credit and lending, MoneyLion buries a provision in its terms and conditions stating: "MoneyLion warrants that it has no legal or contractual claim against you based on your failure to repay in full an Instacash Advance."

147.    In practice, this provision is functionally inoperative. First, MoneyLion's rigorous underwriting practices and detailed financial review (powered by Plaid and Pinwheel) ensure it only lends to users who can repay on their next payday. Second, MoneyLion has cultivated a borrower base comprised of users living paycheck to paycheck who, by virtue of their prior Instacash usage, are dependent on repeat borrowing (and therefore can't afford to

---

[38] Devina Khanna and Arjun Kaushal, *Earned Wage Access and Direct-to-Consumer Advance Usage Trends*, Fin. Health Network (April 2021) at 2, available at https://cfsi-innovation-files-2018.s3.amazonaws.com/wp-content/uploads/2021/04/26190749/EWA_D2C_Advance-_sage_Trends_FINAL.pdf.
[39] *MoneyLion Inc. Form 10-K* (for fiscal year ended December 31, 2024), p. 34, available at https://www.sec.gov/ix?doc=/Archives/edgar/data/0001807846/000095017025026108/ml-20241231.htm#fact-identifier-33 ("MoneyLion 2024 10-K").

avoid repayment and lose access to future borrowing). Third, MoneyLion's "automated collections" (*i.e.*, pre-authorized repayment debits) process is extremely effective and allows MoneyLion to process repayment as soon as funds are available.

148.   Additionally, MoneyLion's internal documents and business plans for Instacash undercut the claim that Instacash advances are not loans. MoneyLion's business plans describe Instacash as "single payment loans" and indicate the due date for the "loan should be on next pay date." Likewise, MoneyLion employees internally refer to amounts owed as "principal" and refer to outstanding amounts as "exposure" and "principal exposed."[40]

149.   MoneyLion closely tracks Instacash default rates and engages in what it characterizes as "collections" activity.

150.   MoneyLion has a Credit Risk team responsible for adjustments to underwriting criteria and who also analyze "Credit Loss performance" among Instacash users.

151.   Likewise, MoneyLion scores users into credit segments and tracks the "unpaid principal rate" for each segment to identify "high risk" users. MoneyLion has at times engaged in experimental programs with high-risk users it has determined were insufficiently creditworthy to receive Instacash loans, and thus rejected them "to help them show us evidence of creditworthiness and migrate them over a few cycles."

152.   MoneyLion's regulatory filings further support that Instacash is a consumer credit product. For instance, MoneyLion's 10-K form provides metrics for "Total Originations" which it defines as "the dollar volume of the secured personal loans originated and Instacash advances funded within the stated period."[41]

---

[40] Though Plaintiffs have not had the opportunity to take discovery and obtain Defendant's internal documents and business plans, the facts referenced herein were made public in an enforcement action brought by the State of New York against MoneyLion Inc., in the Supreme Court of the State of New York that was filed after the instant case.

[41] MoneyLion 2024 10-K, at p. 76.

153.    Indeed, throughout its 2024 Form 10-K filing, MoneyLion treats Instacash together with indisputable credit products, by *inter alia*, stating Instacash and secured loans are both "originated" by MoneyLion, noting that "Credit Builder Loans and Instacash product are financed" similarly, characterizing losses on "Instacash receivables" (alongside losses for "Loan receivables") as "*credit* losses on consumer receivables," and addressing together the "customer's ability to perform under the loan or Instacash advance terms" when discussing default rates.[42]

154.    Also, MoneyLion's characterization of money owed on outstanding Instacash loans constituting "Instacash *receivables*" undercuts the suggestion that repayment is somehow optional and not expected.

155.    Further, MoneyLion characterizes "fee income related to instant transfer fees and tips from Instacash advances" as "banking revenue."[43]

156.    MoneyLion also discloses in its annual report a financial metric for "provision for *credit* losses" on consumer receivables, which include "Instacash advance receivables."[44]

157.    A provision for credit losses is a contra-asset account that represents an estimate of the expected credit losses on financial assets, like loans, that a company holds. MoneyLion describes "provision for credit losses" as follows:

> Provision for credit losses on consumer receivables consists of amounts charged during the period to maintain an allowance for credit losses. The allowance represents management's estimate of the *credit* losses in our consumer receivable portfolio and is based on management's assessment of many factors, including changes in the nature, volume and risk characteristics of the consumer receivables portfolio, including trends in delinquency and charge-offs and current economic conditions that may affect the customer's ability to pay.[45]

---

[42] *Id.* at p. 75–76, 78–79, F-23.
[43] *Id.* at p. 76.
[44] *Id.* at p. 78.
[45] *Id.*

37

158.    In other words, provision for credit losses is essentially a reserve to cover potential losses from borrowers defaulting on their debts. The operative word that stands out in the phrase "provision for credit losses," as it relates to Instacash advances, is of course *credit*.

159.    Returning to its representations to consumers—on its website, MoneyLion categorizes its Instacash product under the general heading "Borrow" alongside indisputable credit products, as shown below:



*Figure 9*

If a user clicks the "Cash Advance" link shown on the above screen on MoneyLion's homepage, they are taken to an "Earned Wage Access" page promoting Instacash and similar products.

160.    In addition, MoneyLion prominently uses words synonymous with loans and consumer credit (albeit misleadingly) in advertisements to consumers. For instance, it claims that with Instacash, "There's no interest charged" and "No credit check." Elsewhere, MoneyLion describes Instacash as "0% APR." Terms like "interest," "APR" and "credit check" are plainly credit-related terms, further supporting that Instacash is a consumer credit product.

161.    In sum, MoneyLion's contention that Instacash is something other than a loan because of the non-recourse language buried in its terms of service is contradicted by the substance of the product, its highly-engineered design that ensures repayment (and has achieved a remarkably low default rate) through its "collections" process, how MoneyLion internally discusses and analyzes Instacash, statements in its annual reports, and how Instacash is described and promoted to users.

**c.  MoneyLion's Loans to Plaintiffs**

162.    Specialist Lowe is currently an active duty servicemember in the National Guard stationed at Fort Benning in Georgia.

163.    He has been an active duty servicemember since 2008 and will remain on active duty until at least 2026.

164.    PO Collins is currently an active servicemember in the U.S. Navy stationed at Naval Station Great Lakes in Lake County, Illinois.

165.    He has been an active duty servicemember since 2015 and will remain on active duty until at least 2025.

166.    Sgt. Fuller is currently an active servicemember in the U.S. Army stationed at Fort Stewart in Georgia.

167.    She has been an active duty servicemember since 2018 and will remain on active duty until at least 2027.

168.    MoneyLion extended consumer credit to Plaintiffs in the form of Instacash loan transactions like those discussed above.

169.    Specialist Lowe, PO Collins, and Sgt. Fuller each used the loans from MoneyLion for personal, family, or household purposes.

170.    Specialist Lowe, PO Collins, and Sgt. Fuller each paid MoneyLion's finance charges, in the form of Turbo speed fees and tips, to obtain cash-advance loans from MoneyLion,

171.    A small selection of Instacash loans made by MoneyLion to Specialist Lowe are shown in the below table, with the estimated cost of credit and MAPR included:

| Date | Principal Amt. | Turbo Fees and/or Tips | Loan Period | APR |
|---|---|---|---|---|
| 2/10/25–2/13/25 | $100.00 | $8.99 | 3 days | 1,093% |
| 2/4/25–2/13/25 | $50.00 | $5.99 | 9 days | 486% |
| 11/27/24–12/6/24 | $100.00 | $8.99 | 9 days | 365% |
| 5/19/24–5/29/24 | $25.00 | $3.99 | 10 days | 583% |
| 11/17/23–11/24/23 | $100.00 | $8.99 | 7 days | 469% |

*Table 1*

172.    A small selection of Instacash loans made by MoneyLion to Sgt. Fuller are shown in the below table, with the estimated cost of credit and MAPR included:

| Date | Principal Amt. | Turbo Fees and/or Tips | Loan Period | APR |
|---|---|---|---|---|
| 4/13/25–4/26/25 | $100 | $9.99 | 13 days | 280% |
| 4/13/25–4/26/25 | $10 | $3.99 | 13 days | 1,120% |
| 3/1/25–3/6/25 | $80.00 | $7.49 | 5 days | 683% |

*Table 2*

173.    A small selection of Instacash loans made by MoneyLion to PO Collins are shown in the below table, with the estimated cost of credit and MAPR included:

| Date | Principal Amt. | Turbo Fees and/or Tips | Loan Period | APR |
|---|---|---|---|---|
| 11/27/24–12/6/24 | $100.00 | $8.99 | 9 days | 365% |

| 11/21/24–12/6/24 | $40.00 | $4.99 | 15 days | 304% |

*Table 3*

174.    Specialist Lowe, PO Collins, and Sgt. Fuller have received dozens of usurious loans from MoneyLion since they began using the service.

175.    The Turbo speed fees and tips are immediately and directly connected to MoneyLion's extensions of credit to Specialist Lowe, PO Collins, and Sgt. Fuller.

176.    Further, MoneyLion's credit agreement required Specialist Lowe, PO Collins, and Sgt. Fuller to purportedly waive their right to a jury trial and waive their right to participate in a class action in violation of 10 U.S.C. § 987(e)(2).

177.    MoneyLion's credit agreement also failed to include mandatory MLA loan disclosures in violation of 10 U.S.C. § 987(c) and TILA.

## VI.    TOLLING

178.    The Servicemember Civil Relief Act ("SCRA"), 50 U.S.C. §§ 3901 *et seq.*, tolls any and all limitations or repose periods for all active-duty military members, including those similarly situated to Specialist Lowe, PO Collins, and Sgt. Fuller, until their active-duty service concludes. Specifically, § 3936(a) of the SCRA provides:

> The period of a servicemember's military service may not be included in computing any period limited by law, regulation, or order for the bringing of any action or proceeding in a court, or in any board, bureau, commission, department, or other agency of a State (or political subdivision of a State) or the United States by or against the servicemember or the servicemember's heirs, executors, administrators, or assigns.

## VII.    CLASS ALLEGATIONS

179.    Specialist Lowe, PO Collins, and Sgt. Fuller seek to represent four classes of individuals pursuant to Fed. R. Civ. P. 23.

41

180.     Plaintiffs seek to represent the "MLA Class" and the "TILA Class"; PO Collins

seeks to represent the "Illinois Class"; and Sgt. Fuller seeks to represent the "Georgia Class."

These classes are referred to collectively as the "Classes" and are initially defined below:

> **MLA Class**: All Covered Members and dependents of Covered Members who
> entered into an agreement with MoneyLion to use its "Instacash" product, in
> which MoneyLion was paid a finance charge (including, without limitation, a
> turbo speed fee or tip).

> **TILA Class**: All Covered Members, dependents of Covered Members, Illinois
> residents, and Georgia residents that entered into an agreement with MoneyLion
> to use its "Instacash" product, in which MoneyLion was paid a finance charge
> (including, without limitation, a turbo speed fee or tip).

> **Illinois Class**: All Illinois residents that entered into an agreement with
> MoneyLion to use its "Instacash" product, in which MoneyLion was paid a
> finance charge (including, without limitation, a turbo speed fee or tip).

> **Georgia Class**: All Georgia residents that entered into an agreement with
> MoneyLion to use its "Instacash" product, in which MoneyLion was paid a
> finance charge (including, without limitation, a turbo speed fee or tip).

181.     Expressly excluded from the Classes are: (a) any Judge presiding over this

action and members of their families; (b) MoneyLion and any entity in which MoneyLion has

a controlling interest, or which has a controlling interest in MoneyLion, and its legal

representatives, assigns and successors; and (c) all persons who properly execute and file a

timely request for exclusion from the Classes.

182.     Specialist Lowe, PO Collins, and Sgt. Fuller reserve the right to amend the

Class definitions if further investigation and discovery indicates that the Class definitions

should be narrowed, expanded, or otherwise modified.

183.     **Numerosity**. MoneyLion's scheme has harmed and continues to harm the

members of the Classes. The members of the proposed Classes are so numerous that joinder of

all members is impracticable.

184.    The exact number of Class members is unknown, but MoneyLion has made millions of loans, and Specialist Lowe, PO Collins, and Sgt. Fuller estimate there are, at least, many thousands of consumers in the MLA Class, TILA Class, Illinois Class, and Georgia Class as MoneyLion has issued thousands of loans to members of the Classes in a manner that violates the MLA, TILA, PLPA, and PLA.

185.    **Commonality**. Common questions of law and fact affect the right of each Class member and common relief by way of damages is sought for Specialist Lowe and Class members.

186.    The harm that MoneyLion has caused or could cause is substantially uniform with respect to Class members. Common questions of law and fact that affect the Class members include, but are not limited to:

a.    Whether Specialist Lowe, PO Collins, and Sgt. Fuller and the MLA Class members are Covered Borrowers subject to the protections and limitations of the MLA;

b.    Whether MoneyLion is a "creditor" subject to the protections and limitations of the MLA;

c.    Whether MoneyLion's loans constitute an extension of "consumer credit" subject to the protections and limitations of the MLA and TILA;

d.    Whether MoneyLion entered into standard form loan agreements with Covered Borrowers;

e.    Whether MoneyLion's loans exceed the MLA statutory rate cap of 36% MAPR;

f.    Whether MoneyLion failed to provide required MLA disclosure in violation of the MLA;

g.  Whether MoneyLion's standard form loan agreements contain a class action waiver provision or jury trial waiver provision in violation of the MLA;

h.  Whether MoneyLion's standard form loan agreements contain an arbitration clause in violation of the MLA;

i.  Whether MoneyLion failed to provide required credit disclosures in violation of the MLA and TILA;

j.  Whether each month MoneyLion charged interest to Specialist Lowe, PO Collins, and Sgt. Fuller and Class Members it restarted the statute of limitations under the MLA;

k.  Whether each month that Plaintiffs and the Class Members paid money to MoneyLion it restarted the statute of limitations under the MLA;

l.  Whether MoneyLion is a "lender" as that term is understood under the PLPA, 815 ILCS 123/15-1-10;

m.  Whether MoneyLion issued "loans" as that term is understood under the PLPA, 815 ILCS 123/15-1-10;

n.  Whether Defendant made loans (as that term is understood under O.C.G.A. § 16-17-2) to Sgt. Fuller and the Georgia Class;

o.  Whether Defendant's loans exceeded the Georgia statutory usury cap;

p.  Whether Class members are entitled to actual or statutory damages for the aforementioned violations and, if so, in what amounts;

q.  Whether MoneyLion should be enjoined from continuing its lending practices in the manner challenged herein;

r.  Whether MoneyLion is subject to punitive damages, and, if so, the proper measure of such damages and remedies to which Specialist Lowe, PO Collins, Sgt. Fuller, and the Class are entitled under 10 U.S.C. § 987(f)(5); and

s.  Any declaratory and/or injunctive relief to which the Classes are entitled.

187.  **Typicality**. The claims and defenses of Specialist Lowe, PO Collins, and Sgt. Fuller are typical of the claims and defenses of the MLA Class because Specialist Lowe, PO Collins, and Sgt. Fuller are Covered Borrowers and their loan agreements with MoneyLion are typical of the type of personal, household, or family loans that MoneyLion normally provides to Covered Borrowers. Additionally, MoneyLion uses the same or substantially similar standard form loan agreement in all of its lending transactions. The documents involved in the transaction were standard form documents and the violations are statutory in nature. Specialist Lowe, PO Collins, and Sgt. Fuller suffered damages of the same type and in the same manner as the Classes they seek to represent. There is nothing peculiar about the Plaintiffs' claims.

188.  **Adequacy**. Specialist Lowe, PO Collins, and Sgt. Fuller will fairly and adequately assert and protect the interests of the Classes. Specialist Lowe, PO Collins, and Sgt. Fuller have hired attorneys who are experienced in prosecuting class action claims and will adequately represent the interests of the Classes, and Specialist Lowe, PO Collins, and Sgt. Fuller have no conflict of interest that will interfere with maintenance of this class action.

189.  **Predominance**. The previously articulated common issues of fact and law predominate over any question solely affecting individual Class Members. Resolution of the common issues in this litigation will resolve virtually the entirety of every Class Members' claims in a single stroke. There are no significant individual questions of liability or damages whatsoever, and certainly not ones that predominate over issues common to the Classes. Thus, predominance within the meaning of Rule 23(b)(3) is established.

190.     **Superiority**. A class action provides a fair and efficient method for the adjudication of this controversy. There are no unusual legal or factual issues that would create manageability problems; Prosecution of thousands of separate actions by individual members of the Classes would create a risk of inconsistent and varying adjudications against MoneyLion and could create incompatible standards of conduct;  Adjudications with respect to individual members of the Classes could, as a practical matter, be dispositive of any interest of other members not parties to such adjudications, or substantially impair their ability to protect their interests; and the claims of the individual Class members are small in relation to the expenses of litigation, making a class action the only procedural method of redress in which Class members can, as a practical matter, vindicate their legal claims and enforce their statutory rights.

191.     MoneyLion has acted and refused to act on grounds generally applicable to the Classes, thereby making declaratory relief and corresponding final injunctive relief under the Federal Rule of Civil Procedure 23(b)(2) appropriate with respect to the Classes. MoneyLion should be enjoined from making loans to Covered Borrowers in violation of the MLA and TILA and a declaration should be made that the loans are void from inception.

### VIII.    CLAIMS FOR RELIEF

### COUNT I
### VIOLATIONS OF MILITARY LENDING ACT

192.     Plaintiffs bring this claim on behalf of themselves and the MLA Class and incorporate paragraphs 1–191 by reference.

193.     The MLA prohibits a creditor from obligating a "Covered Member" or dependent of a Covered Member (collectively, "Covered Borrowers") to a loan in excess of 36% MAPR.

194.    A "Covered Member" in the statute is a "member of the armed forces who is on active duty under a call or order that does not specify a period of 30 days or less."

195.    "The MAPR is the cost of the consumer credit expressed as an annual rate." 32 C.F.R. § 232.3. The MAPR includes as relevant here, "finance charges associated with the consumer credit." 32 C.F.R. § 232.4.

196.    Specialist Lowe, PO Collins, and Sgt. Fuller and the MLA Class Members are "Covered Borrowers," subject to the protections and limitations imposed by the MLA. A Covered Borrower is a consumer who, at the time the consumer becomes obligated on a consumer credit transaction or establishes an account for consumer credit, is a Covered Member of the armed forces or a dependent of a Covered Member (as defined in 32 CFR 232.3(g)(2) and (g)(3)).

197.    Specialist Lowe, PO Collins, and Sgt. Fuller are considered "Covered Borrowers" with respect to their MoneyLion loan agreements because Specialist Lowe, PO Collins, and Sgt. Fuller are an active-duty service members who are obligated by law to repay loans they took out for personal, family or household purposes.

198.    MoneyLion is a "creditor" subject to the requirements and limitations imposed by the MLA in that it engages in the business of extending consumer credit to Covered Borrowers protected by the MLA. 10 U.S.C. § 987(i)(5); also 32 C.F.R. § 232.3(i).

199.    The underlying loan transactions at issue in this case constitute "consumer credit" subject to the protections and limitations imposed by the MLA because they are "credit offered or extended to a Covered Borrower primarily for personal, family, or household purposes," subject to a finance charge and outside the ambit of any of the identified exceptions. 32 C.F.R. § 232.3(f)(1)(i); also 10 U.S.C. § 987(i)(6).

200.    MoneyLion charged Specialist Lowe, PO Collins, and Sgt. Fuller and the MLA class well above the 36% interest rate cap on their loans, in violation of the MLA.

201.    MoneyLion fails to make all the disclosures required by 10 U.S.C. § 987(c)(1)(A) and 32 C.F.R. § 232.6 in its standard form loan agreements, in violation of the MLA.

202.    MoneyLion's standard form loan agreements include mandatory arbitration agreements in violation of 10 U.S.C. § 987(e)(3).

203.    MoneyLion's standard form loan agreements include class action waivers and trial waivers in violation of 10 U.S.C. § 987(e)(2).

204.    MoneyLion's standard form loan agreements use a check or other method of access to a deposit, savings, or other financial account maintained by the borrower as security for an obligation in violation of 10 U.S.C. § 987(e)(5).

205.    As a result, MoneyLion violates 10 U.S.C. § 987.

## COUNT II
## VIOLATIONS OF THE TRUTH IN LENDING ACT

206.    Plaintiffs bring this claim on behalf of themselves and the TILA Class and incorporate paragraphs 1–191 by reference.

207.    TILA and Regulation Z require creditors to provide consumers with specified disclosures for closed-end credit transactions. 15 U.S.C. § 1638; 12 C.F.R. §§ 1026.17, 1026.18. MoneyLion's loan agreements are closed-end credit transactions because they are not open-end credit transactions. Open-end credit transactions are "a plan under which the creditor reasonably contemplates repeated transactions, which prescribes the terms of such transactions, and which provides for a finance charge which may be computed from time to time on the outstanding unpaid balance." 15 U.S.C. § 1602.

208.    Among other requirements, the Regulation prescribes the format of the disclosures, as well as disclosure of certain terms themselves, such as the annual percentage rate and finance charge. 12 C.F.R. §§ 1026.17, 1026.18.

209.    MoneyLion is a creditor whose financing qualifies as "credit" under TILA and Regulation Z, and its loan agreements with consumers are therefore subject to TILA and Regulation Z's disclosure requirements. See 12 C.F.R. § 1026.2(a)(14).

210.    MoneyLion has not provided such disclosures before consummation of the loan agreements.

211.    MoneyLion failed to provide such disclosures to Specialist Lowe, PO Collins, and Sgt. Fuller and the TILA Class.

212.    As a result, MoneyLion violated TILA and Regulation Z. 15 U.S.C. § 1638; 12 C.F.R. §§ 1026.17 & 1026.18.

## COUNT III
## VIOLATIONS OF THE GEORGIA PAYDAY LENDING ACT

213.    Plaintiff Fuller re-alleges and incorporates by reference herein the allegations set forth in the paragraphs 1–191 above.

214.    Plaintiff Fuller brings this claim individually and on behalf of the Georgia Class.

215.    MoneyLion is engaged in the business of making, offering, arranging, or acting as an agent in the making of loans of $3,000.00 or less. O.C.G.A. § 16-17-2(a), (b).

216.    MoneyLion is not a bank or credit union and is not licensed under any Georgia law to engage in that business.

217.    MoneyLion does not meet any of the statutory exceptions to the general prohibition against the making of loans of $3,000.00 or less. See O.C.G.A. § 16-17-2(a)(1)-(4).

218.    Plaintiff Fuller and the Georgia Class are borrowers residing in Georgia who obtained cash-advance loans from MoneyLion and paid interest and other charges in connection with those loans.

219.    MoneyLion advanced funds to Plaintiff Fuller to be repaid at a later date.

220.    MoneyLion's conduct described herein violated and continues to violate the PLA, which means that the loans of Plaintiff Fuller and the Georgia Class were void ab initio, that MoneyLion is barred from collecting any amounts on those loans, and that Defendant is additionally liable to Plaintiff Fuller and the members of the Georgia Class for three times the amount of any interest or other charges, and attorneys' fees and costs. *See* O.C.G.A. § 16-17-3.

221.    Accordingly, Plaintiff Fuller, individually and on behalf of the Georgia Class, requests: (i) payment of all principal of any loans repaid in the last 20 years; (ii) payment of triple the amount of any fees, or other amounts repaid in the last 20 years; (iii) a declaration that Plaintiff's and the Georgia Class members' loans are void ab initio; and (iv) an order prohibiting Defendant from attempting to debit Plaintiff Fuller's or the Georgia Class members' bank accounts to repay any cash advances.

**COUNT IV**
**VIOLATIONS OF THE ILLINOIS PREDATORY LOAN PREVENTION ACT**

222.    Plaintiff Collins re-alleges and incorporates by reference herein the allegations set forth in the paragraphs 1–191 above.

223.    Plaintiff Collins brings this claim individually and on behalf of the Illinois Class.

224.    MoneyLion is a lender, meaning MoneyLion offers or makes loans to Illinois residents.

225.    MoneyLion issued loans to Plaintiff Collins and other Illinois residents.

MoneyLion provided money or credit to Plaintiff and class members in exchange for the consumers' agreement to a certain set of terms, including, but not limited to, finance charges, interest, or other conditions.

226.    Plaintiff Collins and the Illinois Class are borrowers residing in Illinois who obtained cash-advance loans from MoneyLion and paid interest and other charges in connection with those loans.

227.    MoneyLion's expedite fees and subscription charges constitute finance charges for purposes of calculating the applicable APR under the PLPA.

228.    MoneyLion's loans to Plaintiff and the Illinois Class exceed the 36% rate cap set by the PLPA.

229.    The PLPA renders loans made in excess of the 36% APR cap null and void, and provides that the consumer is not obligated to repay any amounts paid or owed on such loans. 815 ILCS 123/15-5-10.

230.    Plaintiff Collins and members of the Illinois Class have paid unlawful fees and finance charges in connection with MoneyLion's loans and are entitled to relief under the PLPA.

231.    MoneyLion's violations of the PLPA "constitute[ ] violation[s] of the Consumer Fraud and Deceptive Business Practices Act" ("CFDBPA").

## PRAYER FOR RELIEF

WHEREFORE, Specialist Lowe, PO Collins, and Sgt. Fuller pray that the Court enter an Order:

> A.    Certifying this action as a class action as provided by Fed. R. Civ. P. 23, appointing Specialist Lowe, PO Collins, and Sgt. Fuller as Class Representatives, and appointing undersigned attorneys and their firms as Class Counsel;

B.  Declaring that MoneyLion violated the MLA and adjudging that Specialist Lowe, PO Collins, Sgt. Fuller, and MLA Class Members' standard form loan agreements violate the MLA;

C.  Adjudging that MoneyLion violated the MLA and awarding Specialist Lowe, PO Collins, Sgt. Fuller, and MLA Class Members actual damages of not less than $500 per violation pursuant to 10 U.S.C. § 987(f)(5)(A)(i);

D.  Adjudging that MoneyLion violated TILA and awarding Specialist Lowe, PO Collins, and Sgt. Fuller and the TILA Class actual damages and statutory damages pursuant to 15 U.S.C. § 1640;

E.  An order awarding the members of the Classes actual, statutory, treble, and all other damages available by law, with pre- and post-judgment interest;

F.  An order providing Plaintiffs and the members of the Classes restitution for any principal, interest, fees, or other charges paid to Defendant;

G.  An order declaring the cash advances that Plaintiff and the Classes obtained were or are void ab initio;

H.  An order preventing Defendant from attempting to collect its cash advances from Plaintiff and the Class members;

I.  Adjudging that MoneyLion violated the MLA and award Specialist Lowe, PO Collins, Sgt. Fuller, and MLA Class Members punitive damages pursuant to the MLA, PLA, and PLPA;

J.  Awarding Specialist Lowe, PO Collins, Sgt. Fuller, and the Classes, reasonable attorneys' fees and costs incurred in this action;

K.  Enjoining MoneyLion from continuing to engage in predatory lending practices in violation of the MLA and TILA;

L.  Awarding Specialist Lowe, PO Collins, Sgt. Fuller, and the MLA Class, any

   pre-judgment and post judgment interest as may be allowed under the law; and

M.  Awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a jury trial on all issues so triable.


Dated: July 7, 2025                    Respectfully submitted,

                                       By: /s/*Joshua R. Jacobson*

                                       THE LAW OFFICE OF THOMAS M. MULLANEY
                                       Thomas M. Mullaney
                                       530 Fifth Avenue
                                       23rd Floor
                                       New York, NY 10036
                                       Telephone: (212) 223-0800
                                       Email: tmm@mullaw.org

                                       CARNEY BATES & PULLIAM, PLLC
                                       Randall K. Pulliam (*pro hac vice*)
                                       Edwin Lee Lowther III (*pro hac vice*)
                                       Courtney Ross Brown (*pro hac vice*)
                                       Samuel R. Jackson
                                       One Allied Drive, Suite 1400
                                       Little Rock, AR, 72202
                                       Telephone: (501) 312-8500
                                       Email: rpulliam@cbplaw.com
                                       Email: llowther@cbplaw.com
                                       Email: cbrown@cbplaw.com
                                       Email: sjackson@cbplaw.com

                                       JACOBSON PHILLIPS PLLC
                                       Joshua R. Jacobson (*pro hac vice*)
                                       2277 Lee Rd., Ste. B
                                       Winter Park, FL 32789
                                       Telephone: (407) 720-4057
                                       Email: joshua@jacobsonphillips.com